In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3691 and 00-1462

Peso Chavez and Gregory Lee,
individually and on behalf of all
persons similarly situated,

Plaintiffs-Appellants,

v.

The Illinois State Police, Terrance
W. Gainer, individually and in his official
capacity as Director of the Illinois State
Police, Michael Snyders, individually
and in his official capacity as Illinois State
Police Operation Valkyrie Coordinator,
Edward Kresl, individually and in his
official capacity as District Commander of
the Illinois State Police, and Larry Thomas,
Daniel Gillette, Craig Graham, Robert
P. Cessna, Robert Lauterbach, and Dale
Fraher, officers of the Illinois State Police,
in their individual capacities,

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 5307--Blanche M. Manning, Judge.

Argued September 13, 2000--Decided May 23, 2001

   Before Flaum, Chief Judge, and Bauer and
Kanne, Circuit Judges.

   Kanne, Circuit Judge.  In this civil
rights lawsuit, a putative class action,
plaintiffs claim that the drug
interdiction unit of the Illinois State
Police (ISP), Operation Valkyrie, has a
practice of stopping, detaining, and
searching African-American and Hispanic
motorists based on their race and without
legally sufficient cause or
justification. The allegation before us,
at its core, is that the ISP engages in
the practice of racial profiling. Racial
profiling is generally understood to mean
the improper use of race as a basis for
taking law enforcement action. Challenges
to the practice of racial profiling have
become increasingly prevalent; indeed,
this suit is part of a larger effort to

challenge the practice nationwide. Defendants-appellees deny that they engage in racial profiling, and claim that they instruct their officers not to use race in determining which motorists to stop, detain, and search.

Plaintiffs filed suit in August 1994, in the United States District Court for the Northern District of Illinois. Defendants included the Director of the Illinois State Police, Terrance Gainer; the ISP Operation Valkyrie Coordinator, Michael Snyders; the District Commander of the ISP, Edward Kresl; and several individual ISP troopers. Plaintiffs alleged numerous violations of their rights and sought damages as well as declaratory and injunctive relief. They based their claims upon the Equal Protection Clause of the Fourteenth Amendment; the right to travel provided by the Privileges and Immunities Clauses of Article IV and the Fourteenth Amendment; the Fourth Amendment; Title VI of the Civil Rights Act of 1964 and the administrative regulations effectuating that Title; and a variety of related supplemental state law provisions. They also sought to impose supervisory liability for these violations upon several ISP personnel under 42 U.S.C. sec. 1983.

Through a series of rulings spanning the five years of litigation below, the district court dismissed the right to travel claim and granted defendants' motions for summary judgment on the equal protection and supervisory liability claims. Additionally, the court determined that plaintiffs lacked standing to obtain injunctive relief, declined to certify a class of Hispanic motorists stopped on the basis of race, denied plaintiffs' motion to add a new named plaintiff to represent the Hispanic class, and denied one of plaintiffs' discovery related motions. In response to these rulings, plaintiffs moved to voluntarily dismiss, with prejudice, their remaining claims. The court dismissed the Title VI regulatory claims pursuant to Rule 16 of the Federal Rules of Civil Procedure, but stated that, if plaintiffs elected to dismiss their remaining claims, the court would impose reasonable costs. Plaintiffs continued to request dismissal, thus the court issued an order dismissing plaintiffs' Fourth Amendment, Title VI, and supplemental

state law claims, with prejudice and pursuant to Rule 41 of the Federal Rules of Civil Procedure.

Plaintiffs now appeal the grant of summary judgment on their equal protection and supervisory liability claims, the dismissal of named plaintiff Peso Chavez's right to travel claim, the finding that they lacked standing to pursue injunctive relief, and the district court's denial of their motions to add a new plaintiff, to certify a class, and to take certain discovery. Plaintiffs also challenge the propriety of requiring them to pay defendants' costs as a precondition to dismissal.

Before we review the procedural and substantive legal challenges raised in this appeal, we will describe the Operation Valkyrie program; detail the facts surrounding the stops, detentions, and searches of each of the named plaintiffs; introduce the statistics plaintiffs have presented in their effort to show that defendants engage in racial profiling; and summarize the relevant procedural history.

I. History

A. Operation Valkyrie

The Illinois State Police run a drug interdiction program entitled "Operation Valkyrie." The program is "designed to acquaint patrol officers with techniques which will enhance their capability to detect and apprehend drug couriers . . . while focusing on the enforcement of highway safety regulations." Operation Valkyrie: An Officer's Guide to Drug Interdiction Techniques i. Since its inception in 1990, the ISP has assigned more than one hundred officers to Valkyrie teams that operate in eleven of the ISP's twenty-one districts. Non-Valkyrie officers also receive Valkyrie training in order to familiarize them with drug-interdiction techniques. Master Sergeant Michael Snyders, the former statewide Operation Valkyrie Coordinator, testified that Valkyrie officers only stop vehicles for traffic enforcement reasons (i.e. for traffic violations or other threats to traffic safety). Once a vehicle is stopped, he explained, Valkyrie officers look for indicators of drug trafficking. These indicators are

numerous--indeed there is a list of twenty-eight factors in the Operation Valkyrie training manual--and include such things as too little or too much luggage for the stated length of trip, maps from drug source cities or states, and air freshener. Officers are also trained to look for verbal and non-verbal signs of stress and deception, such as nervousness and an overly friendly demeanor. Snyders testified that when Valkyrie officers observe these indicators, they are trained to request consent to search the vehicle. In 1992, Valkyrie officers requested permission to search in approximately fourteen percent of motorist stops, and when requested, over ninety-eight percent of motorists granted consent.

Plaintiffs allege that race plays into the Valkyrie officers' decision to stop a motorist--what we will term "pre-stop profiling"--and into the decision to detain or search a motorist, and that no ISP policy prohibits troopers from using race as a factor in making these determinations. As evidence of this, plaintiffs assert that certain ISP drug interdiction training materials emphasize, through statistics, images, and examples, the alleged predominance of Hispanics among those highway travelers carrying illegal drugs. They also point to the testimony of Trooper Robert Cessna, who testified that a motorist's race is one "indicator" that "you've got to keep in mind."

Plaintiffs further assert that Operation Valkyrie grants troopers substantial discretion to decide which motorists to stop and search. ISP training materials acknowledge that discretion can deteriorate into abusive practices, including racial discrimination. Plaintiffs argue that ISP procedures for addressing citizen complaints and reviewing trooper enforcement activity do not sufficiently curb an officer's ability to impermissibly take race into account. When a complaint is filed, a case number is typically assigned, a case is opened, and the complaint is processed. If, however, ISP personnel determine that a complaint is not sufficient for further investigation or that another entity is already investigating the violation, no case is opened. The ISP will not "open a case"

when a citizen complains that he was stopped on the basis of race and issued a traffic citation for an offense he did not commit because the ISP views this issue as one to be resolved by the courts. See Dep. of Teresa Kettelkamp at 86-87 (former deputy director of the Division of Internal Investigation). Apparently, the ISP assumes that the motorist will go to traffic court and allege racial prejudice as a defense to the ticket. In addition, the ISP Office of Inspection and Audits does not investigate the issue of race in trooper enforcement activity.

The ISP presented evidence that Valkyrie officers are taught not to use race in determining what motorists to stop, detain, and search. The training manual for Operation Valkyrie states that the "[ISP] has never endorsed, condoned or promoted the use of any profiling system in its interdiction program." See Operation Valkyrie: An Officer's Guide to Drug Interdiction Techniques i. Training sessions also included presentment of a videotape which emphasizes that drug couriers look "pretty much like everyone else," that it is difficult to characterize smugglers on the basis of nationality, and that ISP officers must have a lawful reason to stop or search motorists.

During the early years of the Valkyrie program, some ISP districts attempted to monitor trooper discretion by collecting data on the race of motorists searched by Valkyrie troopers. One reason for collecting such data, according to Snyders, was to respond to potential questions about whether officers were targeting motorists because of their race. This data was also used as a supervisory tool to ensure that team members were not concentrating on certain ethnic groups. Between 1990 and 1994, monthly statistics in District Six, one of the ISP districts to collect such data, demonstrated that African-Americans and Hispanics comprised over sixty percent of the motorists searched.

B.  The Stops and Searches

1.  The Stop and Search Involving Peso Chavez

Peso Chavez's claim evolved out of the

stop, search, and arrest of a white/1 motorist, George Koutsakis. In November 1992, an Illinois state trooper, and Valkyrie officer, stopped Koutsakis for exceeding the sixty-five mile per hour speed limit. Koutsakis was driving a red or burgundy rental car bearing California license plates, and had open maps, a mobile phone, and fast food wrappers in his vehicle. While the trooper was in the process of issuing a warning ticket, a second Valkyrie officer arrived (Trooper Graham) and walked his drug-detecting canine around the vehicle. The dog alerted, indicating the presence of drugs, and the subsequent search of Koutsakis's vehicle uncovered over two hundred pounds of marijuana in the trunk. Koutsakis's criminal defense attorney, Nancy Hollander, suspected that state troopers were stopping motorists based on skin tone or travel patterns, and decided to explore whether the stop of Koutsakis might have been pretextual. As part of her criminal defense strategy, she thus hired Chavez, a private investigator and New Mexico resident, to recreate the circumstances leading to Koutsakis's stop and arrest.

Chavez, who is Hispanic, emulated the circumstances surrounding Koutsakis's stop and arrest, to see if he would be stopped by the Illinois State Police. He rented a red car with California license plates. On February 18, 1993, he placed open maps, fast food wrappers, a cellular phone, and a gym bag in the car, and proceeded to Interstate 80 ("I-80"). Katherine Austin, a white female from the Public Defenders' Office, followed closely behind him in a separate car. Chavez and Austin traveled to the western edge of Bureau County, Illinois, and began driving east on I-80. When Chavez's vehicle passed State Trooper Larry Thomas, parked on the east-bound shoulder of I-80 at mile post fifty-three, Trooper Thomas decided to follow it. Thomas followed Chavez's vehicle for approximately twenty-four miles, or almost one-half hour, though he could not explain why he decided to do so. Chavez was not speeding; he traveled no faster than sixty miles per hour, although the speed limit was sixty-five. At one point, Thomas drove alongside Chavez's vehicle and looked him in the face. Thomas learned that the car was a rental car after he had a license plate check run

through the dispatcher

Thomas stopped Chavez at about mile post seventy-seven, allegedly because Chavez failed to signal a lane change. Chavez testified that he did signal and denied committing any traffic violation. Austin, who had been following Chavez, agreed. Defendants conceded for the purposes of summary judgment that Chavez did not violate any traffic laws. Thomas approached the car and noticed several items inside, including Chavez's small suitcase, several fast food bags, and an atlas. He also saw Chavez's hands shaking and thought Chavez was nervous. Thomas requested Chavez's driver's license and registration, and returned to his squad car.

Thomas was subsequently joined by Sergeant Dan Gillette, who had been monitoring traffic at mile post seventy-seven. Gillette claims that Thomas told him there was something funny about Chavez, that he smelled air freshener in the car and that he did not see any luggage. Gillette suggested that Thomas run a criminal history check and a check through the El Paso Intelligence Center (EPIC), a database that contains information about border crossings. Gillette then went over to Chavez's vehicle and asked Chavez where he was going. Chavez replied he was going to Chicago for the day; this was not entirely true because Chavez had not yet decided whether he would go or not. To Gillette, Chavez appeared nervous and deceptive regarding his destination. Gillette also testified that he saw a road atlas and fast food wrappers in the car, and thought the car was too clean to have come from Albuquerque. Gillette returned to Thomas's vehicle and Thomas informed him that Chavez's license and registration were valid and that Chavez had no criminal history. Gillette told Thomas that he was still suspicious due to the numerous indicators of drug trafficking.

Thomas issued Chavez a warning ticket based on the alleged failure to signal, and returned Chavez's license and registration once he signed the citation. Thomas then asked Chavez for permission to search his car. Chavez did not consent to the search and stated that he wanted to leave. Based on the indicators,

Gillette felt there was sufficient reason to detain Chavez for a canine walk around, and thus the officers detained Chavez to await the arrival of a canine unit.

When Trooper Graham arrived with his police dog, Krott, Thomas asked Chavez if he would consent to a canine walk-around. Gillette testified that Chavez did not consent, though Thomas's report said he did. The dog did not alert on the first walk-around. Chavez admits that he became nervous during the encounter. Because it was a rental car, he had no knowledge of whether it had previously been used to transport drugs. He also feared that, if the search was unsuccessful, the troopers would become frustrated and plant evidence.

The troopers conducted a second walk-around. Graham testified that this time the canine alerted, but Chavez did not see the alert. In response, Gillette asked Chavez to go sit in Officer Thomas's vehicle. Gillette, Graham, and Trooper Robert Cessna (who went to the scene when radio traffic indicated that Chavez was suspicious) then proceeded to search Chavez's car. The officers examined the car's interior, trunk, and wheel wells, and the contents of Chavez's luggage. The EPIC report then came back and indicated that Chavez's rental car had made several border crossings during the previous year. The car was searched again, this time using flashlights, and this search included an examination of the engine. Again, the officers did not find any contraband. Finally, thirty-five to fifty-five minutes after he was stopped, Thomas told Chavez he was free to go. Thomas completed a field report regarding the search of Chavez's vehicle and listed Chavez's race as "white," despite the fact that the report contained a listing for Hispanic.

Although Chavez resides in New Mexico, plaintiffs allege that his business has a prominent Illinois nexus and Chavez is confident that he will travel to Illinois in the future. Nonetheless, Chavez was not stopped by the ISP on subsequent travel dates of February 25 and 27, 1993, and has not returned to Illinois since February 1993.

2. The Stops and Searches Involving

Gregory Lee

  Gregory Lee, who is African-American, testified that he was unjustifiably stopped, searched, and detained three times in 1993. In late summer or early fall of 1993, Lee was driving west on I-80 with his wife, who is also African-American, when an ISP officer stopped them. Lee says that he had not violated any traffic law. The officer requested consent to search the vehicle, and Lee gave his consent. The officer instructed Lee and his wife to step out of the car. He patted down Lee and indicated that he would pat down Mrs. Lee but then turned and searched the trunk instead. The officer found no contraband, and no ticket or warning was issued.

  In March 1993, Lee was driving on I-80 near Orland Park, Illinois, with his friend, Mike, who is also African-American. ISP Trooper Robert Lauterbach stopped Lee and told him he was speeding, which Lee alleges is false. Trooper Lauterbach asked for Lee's license and then asked him to step out of the car. Once Lee stepped out, the officer brought him back to the rear of the car and at the same time asked Mike to step out of the car. Lee asked the trooper what the problem was and the trooper said something about them looking suspicious. The officer patted them down; at some point, an unidentified second officer arrived. Lauterbach ordered Lee and his friend to kneel on the roadside, behind Lee's vehicle, with their hands on their heads. While they were kneeling, Lauterbach searched the car without Lee's consent--he searched the front and back seat and the glove box--but found no contraband. The officer then returned Lee's license and keys and allowed Lee and his friend to go. No warning or ticket was issued.

  In August 1993, Lee was driving on I-80, at the intersection of I-57, when he was stopped by ISP Trooper Dale Fraher. Lee got out of the car and asked the officer if there was a problem. Fraher claimed that Lee's car wheel was wobbling and that there was a problem with the license plate registration sticker, though plaintiff denies that there was anything wrong with either. After asking for and receiving Lee's drivers' license, Fraher asked if he could search Lee's car, twice

stating that one can never tell with "you people." Lee consented; Fraher searched the car but found no contraband. Fraher then returned Lee's license and allowed Lee to go without issuing a ticket or warning.

Lee alleges that he travels on Illinois highways at least sixty times per year and that he intends to continue doing so. He contacted ACLU attorneys after seeing an article in the Chicago Defender discussing the lawsuit filed by Peso Chavez. The article included the ACLU's phone number, indicating that they would be "willing to listen to anyone else subjected to questionable state police auto searches." Stephen Thomas, ACLU Pulls Over State Police, Chicago Defender, Aug. 31, 1994. Lee contacted the ALCU be cause he felt that he was someone who had a similar experience and later became a party to the current lawsuit.

C.  The Statistics

An ISP stop can generate several types of records. First, when an ISP officer makes a stop he must radio headquarters to convey selected information, including the state and license plate number of the vehicle stopped. Second, if the ISP officer issues a citation or a warning to one or more of the vehicle occupants, this fact is recorded in the "citations and warnings database." This electronic database includes the name of the individual receiving the citation or warning as well as the basis for the action (such as speeding or an illegal lane change). Finally, in a limited number of circumstances an officer will complete a "field report." Field reports are typically completed when contraband is found, when a custodial arrest is made, when canines are involved, or when there is damage to police equipment or injury to a trooper, though even in these circumstances they are not always completed. When ISP officers use Valkyrie skills or obtain information of interest to the Valkyrie program they are encouraged to fill out a field report and to mark it with a "V"--these are referred to as the "Valkyrie field reports."

At plaintiffs' request, the defendants provided the citations and warnings and the field reports databases to Temple University's Center for Public Policy.

The Center analyzed this data and James Ginger and Martin Shapiro, plaintiffs' experts, examined the Center's results./2 Plaintiffs' experts compared the percentage of whites, African-Americans, and Hispanics in the ISP databases with the percent that each race is present in the Illinois population, based on data from the 1990 Census, and present on Illinois roads, as estimated by the Nationwide Personal Transportation Survey (NPTS). In Shapiro's opinion, the field reports indicated a systemic over-representation of African-Americans and individuals of Hispanic origin in Valkyrie police activity. Ginger concluded that officers engaging in drug interdiction efforts selected a significantly higher percentage of Hispanic drivers for discretionary enforcement efforts--defined as activities which give the officer large amounts of latitude in determining what, if any, action to take--than did other ISP officers./3

D.  Procedural History

More than five years of litigation preceded this appeal. Peso Chavez filed this suit as a "civil rights class action" in the U.S. District Court for the Northern District of Illinois on August 30, 1994. After a search for additional plaintiffs, Gregory Lee was one of several people granted leave to join the suit. On November 7, 1995, plaintiffs moved to certify a class of all persons who in the past had been, and in the future would be, unlawfully stopped, detained, or searched by the ISP in accordance with their practice of improperly stopping motorists on the basis of race. On May 23, 1996, plaintiffs filed a third amended complaint, adding an additional plaintiff and fourteen defendants. Plaintiffs subsequently filed a fourth amended complaint in September 1996, dropping seven of the newly named defendants. The original deadline for the completion of fact discovery was December 29, 1995; at plaintiffs' request, this deadline was moved to March 31, 1996, then to May 24, 1996, and eventually to August 30, 1997. Expert discovery closed on November 13, 1998.

On February 9, 1996, the district court dismissed plaintiffs' right to travel

claims under Rule 12 (b)(6) of the Federal Rules of Civil Procedure. On November 5, 1998, the district court granted the defendants' motion for summary judgment on the equal protection and certain of the supervisory claims and granted qualified immunity to several ISP officers on the Fourth Amendment claims. The court also declined to certify a class of all motorists unlawfully stopped due to their race, because the class certification motion appeared to be premised on the defunct equal protection claim. The court stated that plaintiffs would be allowed to renew their motion if they elected to pursue certification based on the claims that survived summary judgment. On April 2, 1999, plaintiffs thus sought to certify "a class consisting of all persons of Hispanic race or color" who had been or would be stopped, detained, or searched by the ISP in violation of Title VI. The same day, twenty months after the close of fact discovery, plaintiffs also sought leave to add Christopher Jimenez as an additional named plaintiff. The court found that the named plaintiffs did not have standing to pursue injunctive relief under Title VI, and thus declined to certify a class of Hispanic motorists with respect to the Title VI claims. The district court also denied plaintiffs' motion to amend their complaint to add Jimenez as a named plaintiff.

In February 1997, the plaintiffs served the Illinois Secretary of State with a subpoena for electronic data on licensed Illinois drivers. The Secretary determined that the plaintiffs were required to pay the statutory rate for provision of such information, and calculated the charge at $160,200. Plaintiffs objected that the charge was excessive, and they argued that they should only be required to pay the cost incurred by the Secretary in providing the information. The court found that the statutory fee of two cents per record was reasonable and overruled plaintiffs' objections.

In August 1999, in response to the court's orders granting summary judgment on a number of the plaintiffs' claims and finding that the plaintiffs lacked standing to pursue their Title VI claims for equitable relief, the plaintiffs moved to voluntarily dismiss with

prejudice their remaining claims. They requested leave to amend their complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure in order to eliminate the Fourth Amendment claims, supplemental state law claims, and Title VI statutory claims. They also moved to dismiss their Title VI regulatory claims pursuant to Rule 16(c)(1). Plaintiffs stated that they did not want to go to trial on these individual damages claims, because such a trial could not provide their desired remedy: injunctive relief against the alleged racial profiling. The court denied plaintiffs' request for leave to amend under Rule 15(a), dismissed the Title VI regulatory claims pursuant to Rule 16, and advised plaintiffs that, if they elected to dismiss claims pursuant to Rule 41(a)(2), the court would impose reasonable costs. Plaintiffs opposed the imposition of costs, but the district court ruled that "an award of reasonable costs will be a condition precedent to entry of an order permitting the plaintiffs to voluntarily dismiss their remaining claims." Chavez v. Ill. State Police, No. 94 CV 5307, 1999 WL 754681, *6 (N.D. Ill. Sept. 9, 1999). On September 16, 1999, the court granted plaintiffs' motion to voluntarily dismiss the remaining claims with prejudice, pursuant to Rule 41(a)(2). Plaintiffs filed a notice of appeal.

In October 1999, defendants moved for immediate payment of all costs. The court granted the motion and taxed costs at $22,800.72. The court reiterated that payment of costs was a condition precedent to its dismissal order, and that the costs award would need to be paid regardless of the result on appeal. Following that decision, the plaintiffs moved to alter or amend the judgment pursuant to Rule 59. Plaintiffs also moved for a stay of payment pending appeal. On January 13, 2000, the district court denied plaintiffs' motion to alter or amend the judgment, but granted the stay of payment. On February 18, 2000, plaintiffs filed their second notice of appeal, regarding the manner in which costs may be taxed as a condition on vol untarily dismissal with prejudice.

II. Analysis

Plaintiffs allege that defendants are liable under 42 U.S.C. sec. 1983, which

"requires proof that the defendants were acting under color of state law and that the defendants' conduct violated the plaintiff's rights, privileges, or immunities secured by the Constitution or laws of the United States." Lanigan v. Vill. of E. Hazel Crest, Ill., 110 F.3d 467, 471 (7th Cir. 1997) (citations omitted). There is no dispute that the defendant officers were acting under color of state law, thus we must examine whether defendants' actions violated plaintiffs' constitutional or statutory rights.

We begin by reviewing the district court's procedural rulings: first, the district court's refusal to certify a class with respect to the plaintiffs' equal protection claims; second, the district court's denial of plaintiffs' motion to amend their complaint to add a new plaintiff; and third, the district court's ruling on a discovery matter. We then review plaintiffs' substantive claims, the first alleging violations of the equal protection clause of the Fourteenth Amendment, and the second alleging violations of the right to travel. Next considered is the grant of summary judgment to defendant Michael Snyders on the issue of supervisory liability, followed by an analysis of the plaintiffs' challenges to the resolution of their Title VI claims. Finally, we address the plaintiffs' challenge to the district court's order making the payment of costs a condition of voluntary dismissal.

A.  Jurisdiction

This court has jurisdiction to hear appeals from "final decisions" of the federal district courts. 28 U.S.C. sec. 1291. An order becomes final or appealable upon the entry of a final judgment. See ITOFCA, Inc. v. MegaTrans Logistics, Inc., 235 F.3d 360, 363-64 (7th Cir. 2000). "The proper appeal of a final judgment renews all issues previously pleaded and resolved by the trial court in litigation." Grun v. Pneumo Abex Corp., 163 F.3d 411, 419 (7th Cir. 1998) (citing In re Grabill Corp., 983 F.2d 773, 775 (7th Cir. 1993)), cert. denied, 526 U.S. 1087, 119 S. Ct. 1496, 143 L. Ed. 2d 651 (1999). Defendants argue that the plaintiffs improperly manufactured appellate jurisdiction by

asking the district court to voluntarily dismiss their claims, and thus argue that we have no jurisdiction to hear the instant appeal. We disagree. While we may not review claims that were dismissed pursuant to plaintiffs' request for voluntary dismissal with prejudice, we will review the district court's rulings with respect to the remainder of plaintiffs' claims. See Gray v. Dane County, 854 F.2d 179, 182 (7th Cir. 1988).

B.  The Procedural Claims

1.  Standard of Review

Plaintiffs challenge a number of procedural rulings made by the district court over the course of this litigation. We will overturn these rulings only if we determine that the court abused its discretion. "'Abuse of discretion' means something more than our belief that we would have acted differently if placed in the circumstance confronting the district judge." Anderson v. United Parcel Serv., 915 F.2d 313, 315 (7th Cir. 1990). "The district court's decision must strike us as fundamentally wrong for an abuse of discretion to occur." Id. However, we must still "scrutinize the district court's determination to ensure that it invoked the correct legal standards and that its findings of fact are not clearly erroneous." Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 739 (7th Cir. 1998).

2.  Denial of Class Certification

Plaintiffs originally filed this suit as a "civil rights class action" on August 30, 1994. On November 7, 1995, they filed a motion for the certification of a class of persons who in the past had been, and in the future would be, unlawfully stopped, detained, and searched pursuant to defendants' practice of stopping, detaining, and searching individuals traveling on highways in Illinois on the basis of race and without legally sufficient cause or justification. When the magistrate judge considered this motion he found that, in light of the court's previous rulings in favor of the defendants' motion for summary judgment on the plaintiffs' equal protection claims, the motion for class certification was moot. See Chavez v.

Ill. State Police, No. 94 CV 5307 (N.D. Ill. Sept. 25, 1997). He thus recommended the denial of the motion for certification of plaintiffs' class without prejudice, with leave to reinstate the motion with respect to any claims that survived summary judgment.

The district judge agreed and found that "it would be wholly illogical to consider the motion," considering that the class certification claim appeared to be premised on an equal protection claim that was no longer viable. Judge Manning stated that "[a] decision that the named plaintiffs' claims lack merit may disqualify them as proper class representatives, thereby mooting the class certification question." Chavez, 27 F. Supp. 2d at 1084 (citing Cowen v. Bank United of Tx, 70 F.3d 937, 941 (7th Cir. 1995)).

The court stated that plaintiffs would be allowed to renew their motion if they elected to pursue certification based on the claims that survived summary judgment. Thus, in early 1999, plaintiffs sought certification of "a class consisting of all persons of Hispanic race or color" who had been or would be stopped in violation of Title VI. Both the magistrate judge and the district court judge found that Chavez did not have standing to pursue prospective relief. The district court judge determined that Chavez could not, therefore, represent a class of Hispanic motorists seeking such relief and dismissed plaintiffs' motion. While plaintiffs assert that this was error, the plaintiffs requested and were granted a voluntary dismissal of their Title VI claims. We will thus not review the district court's refusal to certify a class with respect to those claims.

Plaintiffs argued before the district court, and continue to assert on appeal, that they were entitled to a ruling on the motion for class certification before the district court considered the defendant's motion for partial summary judgment on the plaintiffs' equal protection claims. The district court disagreed. The court noted that a ruling on summary judgment may properly precede a ruling on a motion for class certification. Id. at 1085. Though recognizing that "an accelerated merits

disposition may be preferable when the court considers the merits before ruling on a motion for class certification," the court stated that the delay was "largely attributable to the plaintiffs." Id.

We conduct a deferential review of the denial of plaintiffs' motion to certify a class. Under the Federal Rules of Civil Procedure, "a district court has broad discretion to determine whether certification of a class-action lawsuit is appropriate." Mira v. Nuclear Measurements Corp., 107 F.3d 466, 474 (7th Cir. 1997) (citing Ret. Chi. Police Ass'n v. City of Chi., 7 F.3d 584, 596 (7th Cir. 1993)). In most circumstances, a judge should determine whether to grant or deny certification prior to ruling on the merits, as indicated by the text of Rule 23: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Fed. R. Civ. P. 23(c). This is the preferred policy as "the propriety of class certification does not depend on the outcome of the suit. . . . It is therefore difficult to imagine cases in which it is appropriate to defer class certification until after decision on the merits." Bieneman v. City of Chi., 838 F.2d 962, 964 (7th Cir. 1988) (citations omitted). We have since noted, however, that such situations do exist. If "as soon as practicable" occurs after a case is already "ripe for summary judgment" then it might be proper for a judge to consider a motion for summary judgment prior to considering a motion for class certification. Cowen, 70 F.3d at 941 (citations omitted). Where this situation occurs, if the court determines that the named plaintiffs' claims lack merit, such a decision "ordinarily, though not invariably, . . . disqualifies the named plaintiffs as proper class representatives," thus resolving the issue of class certification. Cowen, 70 F.3d at 941 (citations omitted).

As noted by the district court, plaintiffs requested and were granted numerous stays with respect to the summary judgment motions before the court. In response to plaintiffs' frustration with the delayed consideration of their class certification motion, the district court simply noted that the plaintiffs' actions

caused the delay. Yet this response obscures the fact that it was the district court's decision to consider the summary judgment motions before the class certification motion that led to the delayed consideration of the latter. Indeed, this is why it is preferable to review a motion for class certification first; a quick disposition on the merits is often not possible. Nonetheless, "[w]hile we agree that it is the better policy for the district court to dispose of a motion for class certification promptly and before ruling on the merits of the case, the failure to follow this preferred procedure does not necessarily amount to reversible error." Mira, 107 F.3d at 475. We must thus examine whether the delay in ruling was such that it rose to reversible error.

The denial of class certification was premised on the district court's finding that the named plaintiffs lacked standing to seek injunctive relief, a finding partially linked to the fact that Chavez had not returned to Illinois and had not been stopped since the original stop in 1993. Plaintiffs allege that, if the district court had ruled on class certification as soon as practicable, the mootness of Chavez's claim would not have prevented the class members from proceeding. Yet, even if this were true, the class would not have prevailed on the merits. The plaintiffs' litigation strategy was to present statistics as the basis for their claims, and as we explain in Parts II.D.1.c and II.D.2 below, these statistics are not sufficient to prove a violation of the equal protection clause of the Fourteenth Amendment. This determination would have been made regardless of whether this lawsuit was certified as a class action or not. "[A]lthough the procedural method chosen by the district judge is not the one favored under Rule 23, we refuse to disturb [her] denial of class certification because [ ] the plaintiffs' underlying claims clearly lack merit, as evidenced by our affirmance of the district court's summary judgment rulings . . . ." Myra, 107 F.3d at 475. We thus find that the district court did not abuse its discretion in denying the plaintiffs' motion for class certification with respect to the equal protection claims.

## 3. Denial of Motion to Add Christopher Jimenez as a Class Representative

Plaintiffs also challenge the district court's denial of their motion to add Christopher Jimenez as a class representative. On February 6, 1996, Christopher Jimenez, who is Hispanic, and his fiance, Stacie Tiffany, who is white, were driving northbound on I-55 in Sangamon County, Illinois, in Tiffany's car. Tiffany was driving and admits that she was exceeding the speed limit. Jimenez alleges that ISP Trooper Robert Jennings, a Valkyrie officer, was parked at the side of the road looking at them with binoculars. Trooper Jennings admits that he has been able to detect the race of an occupant of a vehicle by using his binoculars in the past. Jennings saw but did not stop "hundreds" of other speeders that day. Jennings Dep. at 42. He explained that Tiffany's speeding and the fact that a male passenger was slumping in the front seat while wearing a baseball cap drew his attention to Tiffany's vehicle.

Jennings followed the vehicle and saw Tiffany fail to signal prior to changing lanes. He then stopped her, stating that he did so because she was speeding and failed to signal properly. He asked both Tiffany and Jimenez for their drivers' licenses and asked Tiffany questions about the nature of her relationship with Jimenez. According to Trooper Jennings, he is more likely to ask questions about the relationship between vehicle occupants if they are of different races. Although Jennings testified that he did not have a "suspicion" or a "strong feeling" that contraband was in the vehicle, he asked Tiffany for her permission to search her car. Plaintiffs say Jennings justified his request by explaining that "in the past we had made drug seizures from mixed race couples." Jennings Dep. at 76. Tiffany consented. Jennings inspected and patted down the soft-surface bags in the trunk and patted down the area where the convertible's top is stored. He did not discover any contraband. Jimenez filed a written complaint with the ISP one week later, which the ISP deemed unfounded. Nonetheless, Jennings received counseling to make him aware that what he says can impact negatively upon the public, regardless of his intent. While Jimenez

resides in Michigan, plaintiffs allege that he travels on Illinois highways several times per year, although his prior experience with the ISP has so intimidated him that he avoids I-55.

The plaintiffs identified Jimenez as part of the putative plaintiff class in July 1996, when they filed their fourth amended class action complaint. Almost three years later, on April 2, 1999, the plaintiffs moved to add Jimenez as a new named plaintiff pursuant to Rules 15(a) and 21 of the Federal Rules of Civil Procedure. The plaintiffs' motion was untimely, to say the least: fact discovery had closed in August 1997, a final pre-trial order was scheduled to be filed on July 15, 1999, and the trial date was set for September 7, 1999. Magistrate Judge Bobrick denied the plaintiffs' motion. Although he concluded that the plaintiffs met the literal standard for joinder set forth in Rule 20(a), he determined that the court had discretion to deny a motion for joinder "where it would cause delay, prejudice, or expense" and found that adding a plaintiff would do all of those things. Chavez v. Ill. State Police, No. 94 CV 5307, slip op. at 2 (N.D. Ill. June 4, 1999). He noted that plaintiffs had known about Jimenez's claims for nearly three years but offered no explanation as to why they were unable to add Jimenez as a named plaintiff earlier. Plaintiffs objected to the magistrate's order, but on appeal, the district judge found that the order was not clearly erroneous, agreeing that joinder of Jimenez would be prejudicial and that the plaintiffs delayed in seeking to add him as a named plaintiff. The district judge echoed the magistrate judge's observation that "while motions to amend a complaint are ordinarily granted, this is not an ordinary case." Chavez v. Ill. State Police, No. 94 CV 5307, 1999 WL 515483, at *5 (N.D. Ill. July 15, 1999).

Again, we review the district court's ruling for abuse of discretion. No one disputes that joinder of Jimenez would be proper under the text of Rule 20. What is contested is whether the district court abused its discretion to deny leave to amend the complaint so that plaintiffs could join a party./4 Where a responsive pleading has already been served, "a party may amend the party's pleading only

by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, "leave to amend need not be given if there is an apparent reason not to do so, such as 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" Payne v. Churchich, 161 F.3d 1030, 1036 (7th Cir. 1998), cert. denied, 527 U.S. 1004, 119 S. Ct. 2339, 144 L. Ed. 2d 236 (1999) (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)).

Similarly, we also accord wide discretion to a district court's decision concerning the joinder of parties. See Intercon Research Assoc., Ltd. v. Dresser Indus., Inc., 696 F.2d 53, 56 (7th Cir. 1982). We have recognized that this discretion allows a trial court to consider, in addition to the requirements of Rule 20, "'other relevant factors in a case in order to determine whether the permissive joinder of a party will comport with the principles of fundamental fairness.'" Id. at 58 (quoting Desert Empire Bank v. Ins. Co. of N. Am., 623 F.2d 1371, 1375 (9th Cir. 1980)). If joinder would create "prejudice, expense or delay" the court may deny the motion. Charles Alan Wright, et al., Federal Practice and Procedure sec. 1652 at 396 (2001).

The district court conducted a reasoned analysis of whether joinder was appropriate and determined that it would be fundamentally unfair to the defendants to add Jimenez as a named plaintiff. The court found that three factors weighed in favor of granting the motion: plaintiffs had a legitimate reason for requesting joinder in that they wished to substitute Jimenez for one of the formerly named Hispanic plaintiffs who had been dropped from the action; Jimenez was already party to the action and was thus closely related; and jurisdiction would not be affected. Several additional factors, however, weighed in favor of denying the motion.

The court determined that joinder would

be heavily prejudicial to the defendants, as it would require, at a minimum, further deposition testimony. Although Jimenez had been deposed in 1997, it was by telephone, and was much less searching than the depositions of the named plaintiffs. While plaintiffs argued that they would allow additional depositions of Jimenez, the court dismissed this offer:

Contrary to the plaintiffs' position throughout much of this case, discovery deadlines do not exist only to be extended. The court is entitled both to set deadlines and to expect that they will be honored, especially when the plaintiffs are before the court in 1999 shortly before trial seeking to extend a 1997 cut off based on events happening and known to them in 1996.

Chavez, 1999 WL 515483, at *3. The other factors weighing in favor of denying the motion were that Jimenez clearly had notice of the pending action yet plaintiffs did not attempt to join him earlier. "The plaintiffs knew of Jimenez and his claims for nearly three years, and for over one year before the close of fact discovery in 1997 but waited until approximately two months prior to trial to seek to add him as a plaintiff. If this is not delay, nothing is." Id. at *4. The plaintiffs proffered explanation for this delay--that they were waiting for the resolution of a discovery related interlocutory appeal to this Court--was not presented to the magistrate judge and was properly dismissed by the district court. While plaintiffs assert that delay alone is an insufficient reason to deny their proposed amendment, there is a "a sufficient basis for denial of leave to amend . . . when the delay has caused the opposing party undue prejudice." Textor v. Bd. of Regents of N. Ill. Univ., 711 F.2d 1387, 1391 (7th Cir. 1983).

We find that the district court judge did not abuse her discretion in denying the plaintiffs' motion to amend their complaint to add Jimenez as a named plaintiff.

4. Conditioning Third Party Discovery on Payment of $160,000

On February 9, 1997, the plaintiffs served a subpoena on the Illinois

Secretary of State seeking production of eight million electronically stored records containing names, addresses, and related information for Illinois licensed drivers. Plaintiffs intended to use this information as a basis for statistical analysis in support of their Title VI claims. The Secretary of State objected to the subpoena, noting that the plaintiffs had not paid the statutorily required fee. Plaintiffs asserted that they had assumed the role of private attorneys general, and therefore should not have to pay the fee charged to private entities; instead, they argued that they should be treated as a governmental entity and pay only the actual cost for the information. When plaintiffs then moved to compel production, the magistrate judge denied the motion. See Chavez v. Ill. State Police, No. 94 CV 5307 (N.D. Ill. March 6, 1997). The district judge reviewed the magistrate's ruling and concluded that it was proper. See Chavez v. Ill. State Police, No. 94 CV 5307 (N.D. Ill. Jan. 14, 1999); Chavez v. Ill. State Police, No. 94 CV 5307 (N.D. Ill. Dec. 30, 1998). The defendants' motion to quash the subpoena was subsequently granted. See Chavez v. Ill. State Police, No. 94 CV 5307 (N.D. Ill. Jan. 28, 1999).

As we have already noted, plaintiffs' Title VI claims are not before the court. Even if the requested data were intended to support the equal protection or right to travel claims, however, all discovery issues are moot in light of our disposition of these claims. Thus we need not review this issue.

C.  Lee's Identification of the ISP Troopers

As an initial matter, defendants contend that Troopers Lauterbach and Fraher did not stop Lee, and ask for a dismissal based on the threshold unreliability of Lee's eyewitness identifications. Lee was not issued a citation or warning, thus he received no documentation of the stops. To determine the names of the officers who had stopped him, he looked at an array of photographs of Illinois State Police personnel, assembled by the ISP. Lee viewed these photos on two separate occasions, the first was about seventeen months after he was allegedly stopped by Fraher and over twenty-three months after

he was allegedly stopped by Lauterbach. On both occasions, Lee identified Lauterbach and Fraher as the ISP troopers who stopped, detained, and searched him in March and August of 1993, respectively.

The ISP denies that these stops ever occurred. First, Lauterbach and Fraher claim that they do not recall stopping, detaining, or searching Lee. Second, the ISP states that they have no record of any traffic stop of Lee by Lauterbach or Fraher, and no record of either of these officers issuing Lee a citation or warning. Third, defendants contend that the officers were not patrolling the relevant roads on the dates Lee alleges he was stopped. Finally, the ISP claims that Lee's identifications of Lauterbach and Fraher are inherently unreliable, pointing to allegedly serious deficiencies in Lee's identifications of the pertinent officers.

With respect to the first argument, the officers do not claim that they did not stop Lee, only that they do not recall doing so. They have produced no evidence definitively establishing that they were not present when Lee was stopped. Second, the ISP has admitted that records are not generated for all stops; without issuance of a citation or warning a record might not be generated./5 Third, Fraher testified that he patrolled I-80 at the relevant time. While ISP records indicate that Lauterbach was not working during part of the time period in which he is alleged to have stopped Lee, and that during the remainder of this period he was patrolling other roads, the ISP has admitted that troopers sometimes stop vehicles outside their patrol areas.

Finally, we can not conclude that Lee's identifications are so flawed as to be inherently unreliable. The district court concluded that Lee's testimony created a genuine question of material fact and was thus sufficient to withstand summary judgment. See Chavez v. Ill. State Police, 27 F. Supp. 2d 1053, 1079 (N.D. Ill. 1998). We agree. While Lee's descriptions of troopers Lauterbach and Fraher contain certain inaccuracies,/6 we will not resolve credibility disputes on a motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Ritchie v. Glidden Co., 242

F. 3d 713, 723 (7th Cir. 2001). Thus, we proceed to the merits of the plaintiffs' equal protection claims.

D. The Fourteenth Amendment Equal Protection Claims

In November 1998, after over four years of litigation, the district court granted the defendants' motion for summary judgment on the plaintiffs' equal protection claims. We review de novo grants of summary judgment. See Myers v. Hasara, 226 F.3d 821, 825 (7th Cir. 2000). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue of material fact exists, we construe all facts and inferences in the light most favorable to the non-moving party, drawing all reasonable and justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). If, however, the record as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); see also Lindemann v. Mobil Oil Corp., 141 F.3d 290, 294 (7th Cir. 1998).

Plaintiffs assert that the ISP and individual ISP officers utilize impermissible racial classifications in determining whom to stop, detain, and search. Were this proven, it would amount to a violation of the Equal Protection Clause of the Fourteenth Amendment. See Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race . . . . [T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."). The Supreme Court, as well as federal courts across the country, have

begun to address the potential implications of racial profiling. See Illinois v. Wardlow, 120 S. Ct. 673, 681 n.10 (2000) (discussing the conclusion of the New Jersey Attorney General that "minority motorists have been treated differently than non-minority motorists during the course of traffic stops on the New Jersey Turnpike"); United States v. Montero Camargo, 208 F.3d 1122, 1135 (9th Cir. 2000) (en banc) (discussing "[s]tops based on race or ethnic appearance"); Martinez v. Vill. of Mount Prospect, 92 F. Supp. 2d 780, 782 (N.D. Ill. 2000) ("Racial profiling of any kind is anathema to our criminal justice system . . . ."); United States v. Leviner, 31 F. Supp. 2d 23, 33 (D. Mass. 1998) ("Motor vehicle offenses, in particular, raise deep concerns about racial disparity.")./7

Even civil rights litigation must, however, satisfy the requirements of our equal protection jurisprudence. To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose. See Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 272-74, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979); Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264-66, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977); Washington v. Davis, 426 U.S. 229, 239-42, 242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976). We examine each element in turn.

1. Discriminatory Effect

To prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class. See Greer v. Amesqua, 212 F.3d 358, 370 (7th Cir. 2000), cert denied, 121 S. Ct. 568, 148 L. Ed. 2d 487 (2000); Johnson v. City of Fort Wayne, Ind., 91 F.3d 922, 944-45 (7th Cir. 1996). Chavez and Lee may show that the ISP treated them differently than other similarly situated individuals by naming such individuals or through the use of statistics, an issue which we explore in greater depth below. See, e.g., United States v. Armstrong, 517 U.S. 456, 467, 116 S. Ct. 1480, 134

L. Ed. 2d 687 (1996) (noting that the similarly situated requirement was met by the "indisputable evidence" in Hunter v. Underwood, 471 U.S. 222, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985), that Blacks were 1.7 times as likely as whites to suffer disfranchisement under the law in question).

### a. Naming a Similarly Situated Individual

Lee did not attempt to name a similarly situated individual who was not stopped or searched. Chavez alleges that Katherine Austin--the white female from the public defender's office who was following him at the time of his stop-- was a similarly situated individual treated differently. To determine whether Austin was similarly situated to Chavez we "must look at all relevant factors, the number of which depends on the context of the case." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000).

While we have repeatedly discussed the similarly situated requirement in the context of employment discrimination cases, these discussions are rarely extensive and do not provide any magic formula for determining whether someone is similarly situated. This is due, seemingly, to the essentially factual nature of the inquiry. Different factors will be relevant for different types of inquiries--it would be imprudent to turn a common-sense inquiry into a complicated legal one. In determining who is similarly situated, we have also been careful not to define the requirement too narrowly. See, e.g., Freeman v. Madison Metro. Sch. Dist., 231 F.3d 374, 382-83 (7th Cir. 2000); cf. Radue, 219 F.3d at 619 (noting that the similarly situated requirement requires employees to demonstrate that they shared "common features essential to a meaningful comparison" to ensure that the employee who received the more favorable treatment was similarly situated).

Defendants allege that George Koutsakis--the individual stopped by the ISP whom Chavez was emulating--was a similarly situated individual who was treated the same as Chavez. The district court agreed, and determined that Chavez failed to show that he was treated any

differently than a similarly situated white motorist. See Chavez v. Ill. State Police, 27 F. Supp. 2d 1053, 1067 (N.D. Ill. 1998). The district court found that Austin was not similarly situated because she was female, drove a different color car with a non-California plate, did not have the same items visible in her car, and did not receive a warning ticket. See id. The court also stated that "the fact that [Austin] was following Chavez essentially prevented Trooper Thomas from subjecting her to the same treatment as Chavez--he was engaged with Chavez at the time." Chavez v. Ill. State Police, No. 94 CV 5307, slip op. at 22 (N.D. Ill. July 10, 1997).

We do not agree with the district court's treatment of this issue. The relevant inquiry is whether a similarly situated individual was treated differently than the plaintiff, not whether one white motorist was subjected to the same unlawful treatment. Allowing defendants to escape liability for discriminating against Hispanics simply because they occasionally mistreat white motorists would dismantle our equal protection jurisprudence. The fact that Koutsakis was also stopped is simply irrelevant to the inquiry of whether Chavez has shown that a similarly situated individual was treated differently.

Quite to the contrary of defendants' and the district court's assertions, Chavez and Austin were similarly situated in all pertinent respects. Both were driving down the same stretch of I-80 at the same time, and neither committed a traffic violation (defendants have conceded that Chavez did not commit a violation for the purpose of summary judgment). The factors that distinguish Austin from Chavez do not prevent her from being similarly situated. First, the ISP can not legally decide whom to stop on the basis of gender any more than they can do so on the basis of race, thus the fact that Austin is female is not pertinent. Second, nothing in the record indicates that Trooper Thomas stopped Chavez because he was driving a red car, or because he was driving a rental car, or because it was a car with California plates. To the contrary, the ISP asserts that Valkyrie officers do not stop motorists on the basis of these

variables, and plaintiffs have agreed. Third, the objects inside Chavez's vehicle that raised officer suspicion--i.e. the small suitcase, fast food bags, and atlas--were not visible until after Chavez was pulled over, thus they could not have been the basis for the stop. Finally, the fact that Thomas was engaged with Chavez does not prevent Austin from being similarly situated. The whole point of the plaintiffs' claim is that after thirty minutes of trailing the two vehicles, Thomas stopped Chavez, who is Hispanic, rather than Austin, who is white.

We thus find that Austin is a similarly situated individual of an unprotected class who was treated differently than Chavez. That Lee has not been able to name a similarly situated individual treated differently does not, however, end our review of his claims. Plaintiffs attempt to show that similarly situated individuals were treated differently than both Chavez and Lee through the use of statistics. The district court would not allow plaintiffs to use statistics for this purpose, based upon that court's interpretation of United States v. Armstrong, 517 U.S. 456, a recent Supreme Court case addressing the effects prong of the equal protection test. We do not agree with the district court's interpretation of Armstrong or its application of Armstrong to the facts of this case.

b.  Use of Statistics to Show Discriminatory Effect

The Supreme Court has long noted the importance of statistical analysis "in cases in which the existence of discrimination is a disputed issue." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 339, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)./8 While few opinions directly acknowledge that statistics may be used to prove discriminatory effect, the Court has repeatedly relied on statistics to do just that. See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 374, 6 S. Ct. 1064, 30 L. Ed. 220 (1886) (finding that a San Francisco ordinance banning the operation of laundries in wooden buildings was discriminatorily applied to Chinese launderers where the city denied the petitions of some two hundred Chinese applicants who applied

for exemption from the ordinance, but granted all but one of the eighty petitions of the non-Chinese launderers who applied); Hunter v. Underwood, 471 U.S. 222, 227, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985) (finding that the fact that a section of the Alabama Constitution made disenfranchisement of blacks at least 1.7 times more likely than disenfranchisement of whites was "indisputable evidence that the state law had a discriminatory effect on blacks as compared to similarly situated whites")./9 Of course, parties may not prove discrimination merely by providing the court with statistical analyses. The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated. See, e.g., Schweiker v. Wilson, 450 U.S. 221, 233, 101 S. Ct. 1074, 67 L. Ed. 2d 186 (1981) (noting that the plaintiffs did not offer any "statistical support for a contention that the mentally ill as a class are burdened dis proportionately to any other class"). Further, "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." Teamsters, 431 U.S. at 340.

The Supreme Court's decision in Armstrong did not depart from this precedent. Armstrong settled a dispute among the circuits by holding that criminal defendants bringing selective prosecution claims must show that similarly situated individuals were not prosecuted, in order to obtain discovery in support of their claim. Armstrong, 517 U.S. at 468-69. The decision reversed a Ninth Circuit opinion which held that a defendant did not have to demonstrate that the government had failed to prosecute others who were similarly situated; indeed, this was in contrast to the holdings of numerous other courts of appeals, including this one, that "require[d] the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not." Id. at 469 (citing, inter alia, United States v. Mitchell, 778 F.2d 1271, 1277 (7th Cir. 1985)). The Supreme Court made clear that the similarly situated requirement could

not be discarded, reaffirming that the requirement of showing discriminatory effect is a long established requirement in our jurisprudence. Id. at 455. The district court in this case correctly determined that the Supreme Court rejected the statistics proffered by the plaintiffs in Armstrong. See Chavez v. Ill. State Police, 27 F. Supp. 2d 1053, at 1066-67 (N.D. Ill. 1998). The statistics were rejected, however, not because plaintiffs can never use statistics to prove discriminatory effect, but because the particular statistics presented to the Court did not address the relevant issue. The criminal defendants in Armstrong introduced an affidavit claiming that "in every one" of the twenty-four cases handled by the public defender's office in 1991 for violations of 21 U.S.C. sec.sec. 841 and 846, the defendant was African-American. See Armstrong, 517 U.S. at 459. The Court explained: "The study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." Id. at 470. Presumably, then, if the study had demonstrated that whites were arrested and could have been prosecuted but were not, the Court would have found the study more useful. The Court pointed out that "respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court." Id. In light of Armstrong, statistics demonstrating that whites stopped for traffic violations were not detained and searched, even those who displayed indicators of drug trafficking, while similarly situated African-American or Hispanics drivers were detained and searched, would be sufficient to show discriminatory effect.

The district court noted that "at least three appellate court decisions have rejected statistical evidence that failed to identify similarly situated individuals of races other than that of the equal protection plaintiffs." Chavez v. Ill. State Police, No. 94 CV 5307, at 18 (N.D. Ill. July 10, 1997) (citing United States v. Turner, 104 F.3d 1180 (9th Cir. 1997); United States v. Berger, 103 F.3d 67 (9th Cir. 1996); United

States v. Olvis, 97 F.3d 739 (4th Cir. 1996)). While the courts in these cases rejected the statistics presented, they did not reject, as a matter of law, the use of statistical evidence. In two of the cases the statistics were simply held to be insufficient, just like in Armstrong. See Turner, 104 F.3d at 1184-85 (finding that the defendants-- who relied, in part, upon the same data found to be inadequate in Armstrong--had not shown "that similarly-situated defendants of other races had been left unprosecuted"); Olvis, 97 F.3d at 745 (finding that defendant's study "provided no statistical evidence on the number of blacks who were actually committing crack cocaine offenses or whether a greater percentage of whites could have been prosecuted for such crimes"). The defendant in the third case did not even attempt "to provide credible evidence that similarly situated persons of other races could have been prosecuted but were not." Berger, 103 F.3d at 72. Additionally, it is worth noting that all three were criminal cases in which the defendants were seeking discovery in support of a selective prosecution claim.

Even if Armstrong is read to require a criminal defendant in a selective prosecution case to provide the precise name of a similarly situated defendant who was not prosecuted (a possible but unnecessary reading), the rationale behind such a requirement does not apply with equal force in the context of a civil racial profiling claim. While the district court determined that Chavez and Lee's allegations of racial profiling were analogous to selective prosecution claims, we find that numerous differences between the two types of claims make the former distinguishable.

First, the Armstrong court noted that "[t]he similarly situated requirement does not make a selective-prosecution claim impossible to prove." Armstrong, 517 U.S. at 466. In a civil racial profiling case, however, the similarly situated requirement might be impossible to prove. In a meritorious selective prosecution claim, a criminal defendant would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency; conversely, plaintiffs who allege that they were stopped due to racial profiling

would not, barring some type of test operation, be able to provide the names of other similarly situated motorists who were not stopped.

A second distinction between this case and Armstrong is the factual context. The opinion in Armstrong allotted much of its analysis to discussing the nature of selective prosecution claims and the considerations inherent in such claims. The analysis is narrowly focused on the constitutional implications of interfering with the prosecutorial function, a factor at the heart of a criminal defendant's claim of selective prosecution, but not directly at issue in a plaintiff's civil claim of racial profiling. The Court described in detail the constraints imposed upon courts considering claims of selective prosecution:

A selective-prosecution claim asks a court to exercise judicial power over a "special province" of the Executive. The Attorney General and the United States Attorneys retain "broad discretion" to enforce the Nation's criminal laws. They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." As a result, "the presumption of regularity supports" their prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."

. . . .

In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." . . . Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. . . . It also stems from a concern not to

unnecessarily impair the performance of a core executive constitutional function.

Armstrong, 517 U.S. at 464-65 (citations omitted).

In short, Armstrong emphasized both the discretion accorded to prosecutors and the fact that it would not be impossible to name a similarly situated individual treated differently in the context of a selective prosecution claim. We find that, although Armstrong is reasonably read to require criminal defendants to name an individual who was not prosecuted, the instant case involves police conduct, not prosecutorial discretion, and is in a civil, not criminal, context. This case is thus not like Armstrong. Therefore, plaintiffs do not have to provide the court with the name of an individual who was not stopped; instead they may attempt to use statistics to show that the ISP treated them differently than other motorists who were similarly situated. While it is true that statistics alone rarely state a violation of equal protection--indeed, only in the Title VII or jury venire context is this possible, as discussed infra--they can be sufficient to establish discriminatory effect.

c. The Plaintiffs' Statistics

Given our foregoing conclusions, we must now examine the statistics proffered by the plaintiffs. The pertinent inquiry is whether Operation Valkyrie troopers stop, detain, and search African-American and Hispanic motorists when the troopers do not stop, detain, and search similarly situated white motorists. Plaintiffs contend that this question must be answered in the affirmative. They allege that their statistics show that African-American and Hispanic motorists are stopped at a significantly higher rate than are white motorists, based upon the representation of these groups both in the Illinois population and on Illinois roads, thus evidencing a disproportionate impact upon African-American and Hispanic motorists.

There has been extensive debate, before the district court and this court, as to the relative merits of these statistics. Defendants contend that the population benchmarks used to determine the Hispanic

and African-American populations in Illinois are inaccurate, that the ISP databases used to determine what percentages of these groups are stopped by ISP officers do not constitute a random sample of ISP stops, and that the plaintiffs' experts did not take into account appropriate confounding variables. The defendants also challenge the qualifications of plaintiffs' two experts. We will assume for the sake of argument that these experts are qualified because the district court did not address the issue.

The magistrate judge, in his report and recommendation, found that plaintiffs' evidence "simply fails to prove what plaintiffs contend it does." Chavez v. Ill. State Police, No. 94 CV 5307, slip op. at 19 (N.D. Ill. July 10, 1997). He specifically cited the deficiency of the field reports, finding they were "meaningless" because they were not compiled for every stop and, therefore, did not comprise a random or regular sample of motorists stopped by the ISP. Id. The district judge did not examine the merits of the statistics because she determined that, regardless of their merit, they could not salvage the plaintiffs' claims as a matter of law. See Chavez, 27 F. Supp. 2d at 1065. Two years later, defendants moved to strike plaintiffs' experts' reports under the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 592-96, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The district court noted that it was "unclear why the defendants are raising the Daubert issue for the first time now," Chavez v. Ill. State Police, No. 94 CV 5307 (N.D. Ill. July 8, 1999), and denied the motion without prejudice. Chavez v. Ill. State Police, No. 94 CV 5307, 1999 WL 592187, at *22 (N.D. Ill. Aug. 2, 1999). On appeal, plaintiffs request that we remand to the district court for a thorough review of the statistics, if we determine that statistics could be used to show discriminatory effect.

Remand is not necessary. First, the magistrate judge did consider the statistics. "Determining the validity and value of statistical evidence is firmly within the discretion of the district court, and we will reverse its findings only if they are clearly erroneous." EEOC

v. O & G Spring and Wire Forms Specialty Co., 38 F.3d 872, 876 (7th Cir. 1994) (citing Pullman-Standard v. Swint, 456 U.S. 273, 287-90, 102 S. Ct. 1781, 72 L. Ed. 2d 66 (1982)). Second, though our reasons differ slightly from those of the magistrate judge, it is clear that these statistics can not satisfy the discriminatory effect element of the plaintiffs' prima facie case--they are simply insufficient as a matter of law. As we have noted, expert analysis must be both relevant and reliable, and the statistics here are neither. See Adams v. Ameritech Servs., Inc., 231 F.3d 414, 423 (7th Cir. 2000) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)).

We have already discussed the two pertinent ISP databases that contain records resulting from ISP stops: the "citations and warnings" database and the "field reports" database. The citation and warnings database records every citation or warning that is issued, including the name of the individual receiving the citation or warning and the basis for the action. The field reports, in contrast, are only completed in certain limited circumstances such as when contraband is found, when a custodial arrest is made, when canines are involved, or when there is damage to police equipment or injury to a trooper; though even then, they are not always completed. Of the 1.8 million incidents in which citations or warnings were issued in the eleven police districts with Valkyrie teams,/10 only 88,618 resulted in field reports./11 Thus, for the relevant time period, less than five percent of incidents which gave rise to a citation or warning resulted in a field report. Plaintiffs focused primarily on a subset of the field reports--the "Valkyrie field reports." These reports are generated when an ISP officer uses Valkyrie skills or obtains information of interest to the Valkyrie program. The officer is encouraged to fill out a field report and to mark it with a "V."

The ISP does not keep a comprehensive record of all motorists stopped; there is no database that tracks every stop, the race of the parties involved, and whether a search took place. This is ultimately the type of information that would be useful in a suit such as this, as it

would clearly indicate what percentages of African-American and Hispanic motorists were being stopped and searched on Illinois highways. Of course, under Armstrong, plaintiffs have to do more than simply proffer percentages of stops, but we can defer this issue for the moment.

The Valkyrie field reports are the source for the bulk of the plaintiffs' statistics, and were the basis of the equal protection claims they presented to the district court. Plaintiffs assert that the number of Valkyrie field reports issued to Hispanic and African-American motorists is more than two standard deviations over the expected norm, based upon the representation of each of these groups in the population. Such a finding, if based upon appropriate statistical analysis, would be statistically significant. See Adams v. Ameritech Services, Inc., 231 F.3d 414, 424 (7th Cir. 2000) ("Two standard deviations is normally enough to show that it is extremely unlikely . . . that the disparity is due to chance . . . ."); Mister v. Ill. Cent. Gulf R. Co., 832 F.2d 1427, 1431 (7th Cir. 1987) (noting the "'rule' that findings should be accepted as 'statistically significant' when the observations are more than two standard deviations away from the values" that would result if there was no discrimination).

We are reluctant, however, to derive any conclusions about the racial breakdown of those motorists stopped, detained, and searched by Valkyrie officers based upon the Valkyrie field reports. First of all, plaintiffs have not told us how many Valkyrie field reports there are, or how many were analyzed. One record document indicates that there were 306 field reports completed by Valkyrie officers in 1992; plaintiffs then conducted a "random sample" of this data. There is no indication of the total number of stops this is being compared to, thus it is impossible to tell if this sample size is sufficiently large to be reliable. See Soria v. Ozinga Bros., Inc., 704 F.2d 990, 995 (7th Cir. 1992) (noting that "[c]ourts in Title VII actions have almost uniformly rejected statistical conclusions based upon such small samples"). Further, the field reports (and particularly the Valkyrie field

reports) are completed on a selective basis after limited types of enforcement activity. This type of non-random sample might undermine the reliability of the statistics. See, e.g., United States v. Johnson, 185 F.3d 765, 769 (7th Cir. 1999) (explaining difficulties with non-random sampling); Bush v. Commonwealth Edison Co., 990 F.2d 928, 932 (7th Cir. 1993) (noting that the failure to examine a random sample of work records prevented the proffered statistics from demonstrating a pattern of racial discrimination).

While the citations and warnings database--which includes all citations and warnings issued by ISP officers--could potentially provide a more accurate estimation of the numbers of motorists stopped, detained, and searched, this database does not record the race of the motorist. The numbers of Hispanics represented can be estimated through an analysis of Hispanic surnames, but there is no mechanism for calculating the numbers of whites or African-Americans issued citations or warnings. Without comparative racial information, plaintiffs can not prove that they were stopped, detained, or searched, when sim ilarly situated whites were not.

The limitations of the field reports and citations and warnings databases only scratch the surface of potential problems with the proffered statistics. The crux of the matter lies in the population benchmarks. As already noted, the plaintiffs compared the numbers derived from the Valkyrie field reports with the representation of whites, African-Americans, and Hispanics ostensibly in the Illinois population and on Illinois roads. We find that these population benchmarks can not provide an adequate backdrop for assessing the racial composition of drivers faced by Valkyrie officers, and thus can not indicatewhether Valkyrie officers disproportionately stop, detain, and search Hispanics and African-Americans.

The first benchmark used by the plaintiffs was the 1990 Census. It is widely acknowledged that the Census fails to count everyone, and that the undercount is greatest in certain subgroups of the population, particularly Hispanics and African-Americans. See

Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 322-23, 119 S. Ct. 765, 142 L. Ed. 2d 797 (1999); Tucker v. Dep't of Commerce, 958 F.2d 1411, 1412-13 (7th Cir. 1992); David H. Kaye & David A. Friedman, Reference Guide on Statistics, in Reference Manual on Scientific Evidence 83, 98 (Federal Judicial Center ed., 2d ed. 2000). We further note that the preliminary data from the 2000 Census indicates that the number of Hispanics and Latinos living in the United States has increased by 57.9% over the past ten years. See U.S. Census 2000 Population and Housing Tables, PHC-T-1, tbl. 4, at http://www.census.gov/population/www/cen2000/tablist.html (last visited April 18, 2001). The data also indicates that in 2000, 12.3% of the Illinois population was Hispanic or Latino, as compared to 7.9% in 1990. See id. at PHC-T-6, tbl. 5. This recent data is simply another indication that the 1990 Census may not have accurately represented the Hispanic and African-American populations in Illinois for the relevant period.

Despite its flaws, the Census data may be the best population data available. It is utilized by the state of Illinois to conduct redistricting, see Ill. Const. art. IV, sec. 3(b), and is occasionally referenced by this court in order to determine the representation of varying ethnic and racial groups in the population. See, e.g., Bradley v. Work, 154 F.3d 704, 706 (7th Cir. 1998); United States v. Barry, 71 F.3d 1269, 1272 n.2 (7th Cir. 1995). Even if it were entirely accurate, however, Census data can tell us very little about the numbers of Hispanics and African-Americans driving on Illinois interstate highways, which is crucial to determining the population of motorists encountered by the Valkyrie officers. Other surveyors have noted as much, and have "sought to measure the racial composition of the traveling public on the road." David A. Harris, The Stories, The Statistics, and The Law: Why "Driving While Black" Matters, 84 Minn. L. Rev. 265, 278 (1999) (discussing the study by Dr. John Lamberth of Temple University in which he constructed teams to "count[ ] the cars on the road and tabulate[ ] whether the driver or another occupant appeared black").

Perhaps to address this problem, the

plaintiffs also relied upon the 1990 Nationwide Personal Transportation Survey (NPTS). This is a nationwide telephone survey conducted every five years by the Federal Highway Administration of the U.S. Department of Transportation, aimed at providing a "picture of passenger travel in the United States." Nationwide Personal Transportation Survey, at http://www.bts.gov/ntda/npts (last visited April 18, 2001). Plaintiffs utilized the NPTS to ascertain the percentage of personal vehicle trips taken by African-American and Hispanic drivers, as well as the number of personal vehicle miles driven by these groups. The data, however, was not intended to be used in this manner. The survey itself noted that "the samples were designed to produce regional and national-level estimates. Thus, estimates for individual local areas . . . or States may not be based on large enough sample sizes and may be imprecise." User's Guide for the Public Use Tapes: 1990 Nationwide Personal Transportation Survey, II-4. The small sample sizes were noted within the survey material: only 868 households in Illinois participated, encompassing 1120 whites, 118 blacks, and 51 Hispanics. Due to the small numbers of African-Americans and Hispanics surveyed, the NPTS data would suggest that there are even fewer African-Americans and Hispanics in Illinois than is indicated by the Census. Clearly, the NPTS was not intended to provide and can not accurately provide racial breakdowns for the population of motorists on Illinois roads. Further, while the survey is "particularly well suited for measuring repetitive, local travel," Nationwide Personal Transportation Survey, at http://www.bts.gov/ntda/npts (last visited April 18, 2001), it is less relevant to determining who is traveling on the interstate highways. Neither can it indicate the number of non-Illinois residents traveling on the interstate highways.

The defendants' expert claimed that the "insurmountable problem with the statewide tests is with the overall population benchmark." Donahue Report at 14. We agree. These population baselines are simply insufficient to determine the racial makeup of motorists on Illinois highways. Thus, without reliable data on whom Valkyrie officers stop, detain, and

search, and without reliable data indicating the population on the highways where motorists are stopped, detained, and searched, we can not find that the statistics prove that the Valkyrie officers' actions had a discriminatory effect on the plaintiffs.

2. Discriminatory Intent

We have found that Chavez has proven that defendants' actions had a discriminatory effect on him but that Lee, who relied solely on the plaintiffs' statistics, has not. Even if we had determined that Lee proved effect, however, both plaintiffs must still prove discriminatory intent in order to establish a violation of the Equal Protection Clause. See Washington v. Davis, 426 U.S. 229, 242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976); Greer v. Amesqua, 212 F.3d 358, 370 (7th Cir. 2000), cert denied, 121 S. Ct. 568, 148 L. Ed. 2d 487 (2000); Johnson v. City of Fort Wayne, Ind., 91 F.3d 922, 945 (7th Cir. 1996). Plaintiffs must show that the "decisionmakers in [their] case acted with discriminatory purpose." McClesky v. Kemp, 481 U.S. 279, 292, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987); Nabozny v. Podlesny, 92 F.3d 446, 453 (7th Cir. 1996). "''Discriminatory purpose' . . . implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group.'" McClesky, 481 U.S. at 298 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979)); Hearne v. Bd. of Educ. of City of Chi., 185 F.3d 770, 776 (7th Cir. 1999) (same).

Plaintiffs offer little evidence specific to their case that would support an inference that racial considerations played a part in their stops, detentions, and searches. Instead they argue that their statistics compel an inference of purposeful discrimination. We will consider the non-statistical evidence first, construed in the light most favorable to the plaintiffs.

Plaintiffs present evidence relating both to the named plaintiffs' stops and to the ISP in general. During the stop

and search of Gregory Lee, it is asserted that Trooper Fraher justified the stop by saying that one can never tell with "you people." Trooper Cessna, a participant in the search involving Peso Chavez, said in his deposition that he was trained that a motorist's race is one "indicator" that "you've got to keep in mind." The remainder of the evidence relates to the operations and practices of the ISP: 1) The ISP will not "open a case" when a citizen who received a citation complains that he did not commit any offense, but was instead stopped on the basis of race; 2) The ISP's Office of Inspection and Audits does not investigate the issue of race as it affects trooper enforcement activity; 3) Selected ISP drug interdiction training materials emphasize the alleged predominance of Hispanics among those highway travelers carrying illegal drugs; 4) Through affidavit testimony one trooper said that ISP officers are not prohibited from considering race as a factor, and another stated that race can be a permissible factor to consider in deciding what motorists to stop (for example, in the context of an all-points bulletin or in deciding to conduct a Terry stop); and 5) From 1990 to 1994 Snyders reviewed monthly statistics showing that African-American and Hispanic motorists comprised more than sixty percent of motorists searched by Valkyrie officers in District Six.

In order to carry their burden, Chavez and Lee must prove that they were stopped, detained, and searched because the defendant officers involved in their stops were motivated by a discriminatory intent. Chavez points to one piece of indirect evidence that his stop was racially motivated: Trooper Cessna, one of the officers who searched Chavez, testified that sometimes race is an indicator to keep in mind. Other evidence weighs against drawing a conclusion of discriminatory intent. As part of his investigation in the Koutsakis case, Chavez submitted a written memo to Nancy Hollander detailing the February 18, 1993 stop and search; he stated that none of the troopers said anything which "appeared to be racially motivated." Further, Trooper Thomas listed Chavez's race as "white" on the field report regarding Chavez's stop and search, even though there was a listing for

"Hispanic." There is nothing in the record to indicate that Thomas thought Chavez was Hispanic and simply decided to list his race as white in an attempt to disguise his motivations.

Lee offers specific evidence of racial animus during his stop: the statements made by Trooper Fraher that one can never tell with "you people." While we certainly do not approve of racially insensitive remarks, such comments do not by themselves violate the Constitution. See Sherwin Manor Nursing Ctr. v. McAuliffe, 37 F.3d 1216, 1221 (7th Cir. 1995); Bell v. City of Milwaukee, 746 F.2d 1205, 1259 (7th Cir. 1984). "This does not mean, however, that the use of racially derogatory language is without legal significance. Such language is strong evidence of racial animus, an essential element of any equal protection claim." DeWalt v. Carter, 224 F.3d 607, 612 n.3 (7th Cir. 2000); Bell, 746 F.2d at 1259. Lee has not proffered any evidence of racial animus on the part of the other officers who allegedly stopped and searched him. The other officers who stated that race might be a factor to consider had nothing to do with the stops of Lee or Chavez.

The allegations relating to the practices and procedures of the ISP do not demonstrate discriminatory intent in the stopping of the named plaintiffs because plaintiffs have not shown that the ISP required or encouraged Valkyrie officers to racially profile. There is actually evidence to the contrary. The first page of the Operation Valkyrie Officer's Guide to Drug Interdiction Techniques states:

The success of the Valkyrie program is directly linked to its eschewment from the use of any form of violator profiles. The Illinois State Police has never endorsed, condoned or promoted the use of any profiling system in its interdiction program. Criminal elements exist in virtually every racial, national, tribal, religious, linguistic and cultural group. An officer whose enforcement stops are based on ethnicity is guilty of civil rights violations and is subject to prosecution in the federal courts. Criminality transcends any perceived racial, ethnic or socio-economic parameters; to focus on a single segment

of society is to limit your enforcement opportunities.

Operation Valkyrie: An Officer's Guide to Drug Interdiction Techniques at i. Even a stringent review of the tapes of Officer Snyders' training sessions shows that, during the sessions, Snyders discourages the use of race as an indicator as "counterproductive." One of plaintiffs' experts-- James Fyfe, professor in the Criminal Justice Department at Temple University--stated that, based on the material he had reviewed, the ISP was doing a "terrific job of apprehending drug offenders in a way that acknowledges people's constitutional rights." Plaintiffs' Amended Response to Defendants' Ninth Request for Admission of Facts para. 8.

Just because the official policy is to decry racial profiling, however, does not automatically mean that defendants are free from reproach:

We are satisfied that the State Police does not embrace an official policy to engage in racial profiling or any other form of intentional disparate treatment of minority motorists. To the contrary, the officially-stated policy has always been to condemn reliance upon constitutionally-impermissible factors. The message in these official policies, however, was not always clear and may have been undermined by other messages in both official and unofficial policies. What really matters, ultimately, is how official policies are interpreted and translated into actual practices in the barracks across the state and out on the road.

State v. Ballard, 752 A.2d 735, 744 (N.J. Super. Ct. App. Div. 2000). In this case, though, we do not think that the one ISP document referencing the high number of Hispanics involved in the drug trade visibly undermined the message that racial profiling was illegal and to be avoided.

Plaintiffs' non-statistical evidence does not prove that the defendants intended to discriminate against Chavez when they stopped and searched him. Nor is there sufficient evidence to conclude that the three different troopers who stopped Lee did so with intent to

discriminate. We thus turn to plaintiffs' statistical evidence.

Only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation," McClesky v. Kemp, 481 U.S. 279, 293 n.12, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (citing Gomillion v. Lightfoot, 364 U.S. 339, 81 S. Ct. 125, 5 L. Ed. 2d 110 (1960); Yick Wo v. Hopkins, 118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220 (1886)), though "the Court has accepted statistics as proof of intent to discriminate in certain limited contexts." Id. at 293. Specifically, "[t]he Court has accepted statistical disparities as proof of an equal protection violation in the selection of a jury venire in a particular district" and "has accepted statistics in the form of multiple-regressions analysis to prove statutory violations under Title VII of the Civil Rights Act of 1964." Id. at 293-94; see, e.g., Int'l Bhd. of Teamsters, 431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977); EEOC v. O & G spring & Wire Forms Specialty Co., 38 F.3d 872, 876 (7th Cir. 1994). It is possible that the Supreme Court would also accept statistics as sole proof of intent in the context of challenges to legislative redistricting. See Hunt v. Cromartie, 526 U.S. 541, 548-49, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999) (finding that circumstantial evidence, including statistical evidence, "tend[ed] to support an inference that the state drew its distinct lines with an impermissible racial motive--even though [plaintiffs] presented no direct evidence of intent"); Smith v. Boyle, 144 F.3d 1060, 1067-68 (7th Cir. 1998) (Flaum, J. concurring in part and dissenting in part) (noting that Supreme Court cases addressing legislative redistricting indicate that discriminatory effect might suffice to establish intent); see also Gomillion v. Lightfoot, 364 U.S. 339, 81 S. Ct. 125, 5 L. Ed. 2d 110 (1960) (finding that the Alabama legislature violated the Fifteenth Amendment by altering the city boundaries in a way that excluded 395 of 400 black voters without excluding a single white voter). None of these situations, however, are before us. Instead, plaintiffs ask us to rely on their statistics, which allegedly show discriminatory effect, to conclude that the ISP and the individual officer-defendants are intentionally

discriminating against the plaintiffs. In this context, statistics may not be the sole proof of a constitutional violation and neither Chavez nor Lee have presented sufficient non-statistical evidence to demonstrate discriminatory intent.

The plaintiffs have thus not met their burden of showing that the ISP or its individual officers purposefully discriminated against them. Because plaintiffs have not proven the prima facie elements of an equal protection claim under the Fourteenth Amendment, we will affirm the district court's grant of summary judgment in favor of the defendants.

E.   Right to Travel Claims

The plaintiffs' first amended complaint alleged that the defendants' actions unreasonably burdened the fundamental right to travel guaranteed by Article VI, Section 2 of the U.S. Constitution and by the Privileges and Immunities Clause of the Fourteenth Amendment. The plaintiffs claimed that defendants' conduct prevented them from "freely traveling the highways in the State of Illinois." The district court determined that, while plaintiffs' complaint alleged violations of the right to travel, the factual allegations of the complaint failed to allege any violations of the right to interstate travel--that is, the right to travel among the states. See Chavez v. Ill. State Police, No. 94 CV 5307, 1996 WL 65992 (N.D. Ill. Feb. 12, 1996). Thus, the court concluded that only intrastate travel--travel within the state of Illinois--was raised by the allegations of the complaint. See id.

The district court then determined that "[n]either the Supreme Court nor the Seventh Circuit have addressed whether intrastate travel is afforded the same protection under constitutional principles as interstate travel" and declined to conclude that it is. Id. The court dismissed the plaintiffs' claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs appeal this ruling, arguing that Chavez's right to travel claim should not have been dismissed.

We review the district court's dismissal under Rule 12(b)(6) de novo, examining a

plaintiff's factual allegations and any inferences reasonably drawn therefrom in the light most favorable to the plaintiff. See Marshall-Mosby v. Corp. Receivables, Inc., 205 F.3d 323, 326 (7th Cir. 2000). Dismissal under Rule 12(b)(6) is proper only if the plaintiff could prove no set of facts in support of his claims that would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); Veazey v. Communications & Cable of Chi., Inc., 194 F.3d 850, 854 (7th Cir. 1999). "[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." Veazey, 194 F.3d at 854 (citing Graehling v. Vill. of Lombard, Ill., 58 F.3d. 295, 297 (7th Cir. 1995)).

The right to travel "embraces at least three different components:" 1) the right of a citizen of one state to enter and leave another state; 2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second state; and 3) for those travelers who elect to become permanent residents, the right to be treated like other citizens of that state. See Saenz v. Roe, 526 U.S. 489, 500, 119 S. Ct. 1518, 143 L. Ed. 2d 689 (1999).

We do not agree with the district court that Chavez's claim only alleged a violation of his right to intrastate travel. Chavez alleges, in effect, that the ISP's practices are a barrier to his ability to enter and leave the state of Illinois. This is a legal claim based on the first component of the right to interstate travel, and the district court should have examined whether the complaint properly stated a claim under this component. We will thus consider whether Chavez could prove any set of facts that would prevent dismissal of his interstate travel claims under Rule 12(b)(6).

The first component of the right to travel prohibits direct impairment of the right to move between the states, that is, the right to go from one place to another, including the right to cross state borders while en route./12 The scope of this component is not well defined because it has received only

limited treatment from the Supreme Court. Past cases "spoke in terms of 'actual barriers' to interstate movement," though the component may encompass a broader range of prohibitions. Md. State Conference of NAACP Branches v. Md. Dept. of State Police, 72 F. Supp. 2d 560, 568 (citing Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 277, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993); Zobel v. Williams, 457 U.S. 55, 60 n.6, 102 S. Ct. 2309, 72 L. Ed. 2d 672 (1982)). Even giving this prohibition a broad scope, however, plaintiffs' factual allegations, if proved, would not demonstrate any direct impairment. Defendants have done nothing to prevent Chavez from entering or leaving the state. Further, Chavez has asserted that he will travel to Illinois in the future, not that the defendants are preventing him from doing so. Chavez's claim that he was stopped in Illinois on the basis of his race, simply does not state a right to travel claim, based upon the first component of that right, under which relief could be granted. See Saenz, 526 U.S. at 501 (noting that the California statute at issue, limiting the maximum welfare benefits available to newly arrived residents, did not impose an obstacle to plaintiffs' entry into the state).

We thus turn to the second component of the right to travel, expressly protected by Article IV, Section 2, Clause 1 of the Constitution: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The purpose of this provision is to protect non-residents from discrimination "where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other states." Saenz, 526 U.S. at 502 (citing Toomer v. Witsell, 334 U.S. 385, 396, 68 S. Ct. 1156, 92 L. Ed. 1460 (1948)). Plaintiffs allege that the ISP's practice of stopping, detaining, and searching African-American and Hispanic motorists unreasonably burdens their right "to be treated as welcome visitors" in Illinois. Plaintiffs' complaint does not allege that the ISP discriminates against non-residents, however, but that the ISP targets all African-American and Hispanic motorists, regardless of their state of origin. This allegation does not state a claim under the Privileges and Immunities

Clause of Article VI.

Plaintiffs also allege, on appeal, that the defendants target African-Americans and Hispanic motorists from states in the American southwest. Defendants have repeatedly asserted that Valkyrie officers are not trained to stop people based on any type of indicator, race or otherwise, yet the defendants contradict this statement at least twice: 1) the defendants' statistical expert stated that ISP officers would be more inclined to stop a vehicle with a license plate from a drug source state than a vehicle with a license place from a non-drug source state; and 2) the defendants' appellate brief stated that "Valkyrie troopers focus on whether a particular vehicle or driver is both violating the traffic laws and also displaying any combination of DEA-approved characteristics associated with drug couriers, such as license plates from a drug source state."

While the allegation that defendants stop motorists driving cars from drug source states was not before the district court, the well-established law of this circuit provides that, when reviewing a dismissal under Rule 12(b)(6), "'we will consider new factual allegations raised for the first time on appeal provided they are consistent with the complaint.'" Veazey, 194 F.3d at 861 (quoting Highsmith v. Chrysler Credit Corp., 18 F. 3d 434, 439 (7th Cir. 1994)). The allegation, however, is rife with problems.

First, the allegation that Chavez was stopped because he had an out of state license plate is not consistent with the complaint. The complaint is hinged upon the allegation that Chavez was stopped because of his race. He has never alleged that he was stopped because of his out of state license plate. Second, plaintiffs asked this court to ignore the possibility that Valkyrie officers stop vehicles with out of state plates for the purposes of the equal protection analysis, dismissing the idea as a late-day attempt by the ISP to justify the high numbers of Hispanics stopped. The final blow, however, is plaintiffs' own admission that the ISP does not engage in pre-stop profiling based on license plates:

The deposition testimony both of front-line Valkyrie troopers and of the head of the Valkyrie program shows that Valkyrie troopers do not profile prior to stopping a car; rather, Valkyrie encounters emerge from routine traffic stops. In fact, significant evidence demonstrates that the Valkyrie program does not train officers which motorists to stop for violations of the traffic code; rather, Valkyrie officers are trained to identify indicators of drug trafficking only after a vehicle has already been stopped.

Plaintiffs' Preliminary Response to Defendants' Daubert Motion to Strike Plaintiffs' Expert Reports, at 17-18. Plaintiffs can not base their right to travel claim upon something that they have admitted does not occur.

In light of the above analysis, we will affirm the Rule 12(b)(6) dismissal of Chavez's right to travel claim. We do not reach the question of whether targeting vehicles with out of state license plates would be a violation of the right to travel.

F. Supervisory Liability Under 42 U.S.C. sec. 1983

Plaintiffs claim that defendant Master Sergeant Michael Snyders, the former statewide coordinator of the Valkyrie program, is liable under 42 U.S.C. sec. 1983 for his supervision of the officers charged in this action./13 The defendants moved for summary judgment on the supervisory liability claim, and the magistrate judge recommended granting the motion. The district court agreed and granted summary judgment, finding that "the plaintiffs have failed to point to any evidence linking Snyders' training to Cessna's use of race, and have failed to create a question of material fact as to whether Snyders taught state troopers to use race as a factor in their work, or facilitated or condoned racially discriminatory enforcement." Chavez, 27 F. Supp. 2d at 1076.

We review de novo a grant of summary judgment, as explained above. "Liability under sec. 1983 requires proof that the defendants were acting under color of state law and that the defendants' conduct violated the plaintiff's rights,

privileges, or immunities secured by the Constitution or laws of the United States." Lanigan v. Vill. of E. Hazel Crest, Ill., 110 F.3d 467, 471 (7th Cir. 1997) (citations omitted). No one disputes that Snyders acted under color of state law, thus we move to the question of whether plaintiffs have established that he "was personally responsible for the deprivation of a constitutional right." Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995).

The doctrine of respondeat superior can not be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights. See id. "Supervisory liability will be found, however, if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." Lanigan, 110 F.3d at 477 (citations omitted). That is, "to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct." Id. (citations omitted). "[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable . . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." Jones v. City of Chi., 856 F.2d 985, 992-93 (7th Cir. 1988) (citations omitted).

1. Supervision of Valkyrie Troopers

Plaintiffs allege that as head of the District Six Valkyrie team, and then as the Statewide coordinator of Operation Valkyrie, Snyders was in a position which entailed supervision and extensive monitoring of Valkyrie troopers. Yet Snyders was not in a supervisory position with respect to any of the troopers named in this case. He was not part of the police chain of command, rather, he conducted training sessions that the officers attended. Plaintiffs have proffered no support for the proposition that an individual who trains officers can be deemed to be their supervisor. "It is not the obligation of this court to research and construct the legal arguments open to parties, especially

when they are represented by counsel." Sanchez v. Miller, 792 F.2d 694, 703 (7th Cir. 1986); see also Fed. R. App. P. 28(a)(9). We thus find that Snyders can not be held liable based on any alleged supervision of the Valkyrie troopers.

## 2. Failure to Intervene

From 1990 to 1994, Snyders reviewed monthly statistics showing that African-American and Hispanic motorists comprised more than sixty percent of motorists searched by Valkyrie officers in his district, yet Snyders did not keep statewide statistics after being promoted to statewide Valkyrie coordinator. Plaintiffs assert that this creates an issue of fact as to whether Snyders failed to intervene to prevent constitutional violations. Omissions can violate civil rights, and "under certain circumstances a state actor's failure to intervene renders him or her culpable under sec. 1983." Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994); see also Gossmeyer v. McDonald, 128 F.3d 481, 494 (7th Cir. 1997) (applying the Yang analysis to a search and seizure claim). Yang summarized the responsibility to intervene:

An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under sec. 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

37 F.3d at 285 (citations omitted).

Presumably, plaintiffs believe that Snyders is liable under the third category of Yang. We have already found that the plaintiffs did not prove a violation of their right to equal protection. Snyders can not be held liable for failing to intervene to prevent a constitutional violation that plaintiffs have not proven. Further, even if there had been a constitutional violation, Snyders would not have been present and thus would have been unable

to intervene, rendering him not liable. We thus decline to find Snyders liable based on his alleged failure to intervene.

3. Personal Responsibility for Deprivation of a Constitutional Right

Snyders could still be liable if he was personally responsible for the deprivation of plaintiffs' constitutional rights. He will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent. See Gentry, 65 F.3d at 561 (citations omitted). The magistrate judge found that the evidence "fails to demonstrate that Snyders instructed, or even encouraged or consented to, the use of race as an indicator of illegal drug activity." Chavez, No. 94 C 5303, at 30 (N.D. Ill. July 10, 1997). We agree.

Plaintiffs' assertion that Snyders instructed officers to use race as an indicator is based on two facts in the record: 1) Snyders' training sessions included references to drug distribution by Hispanics and 2) Trooper Cessna, who testified that race was one indicator to keep in mind, identified Snyders as one of two officers who participated in his Valkyrie training.

With respect to the first, neither the tapes of those sessions nor the written materials presented at the sessions support a conclusion that Snyders instructed officers to use race as an indicator. At the beginning of the session, Snyders explains to the officers that the training does not teach them whom to stop, but rather teaches observational skills to improve their awareness during all stops. Snyders also states that profiles are ineffective, and that "if troopers waited for Mexicans driving pick-ups, they'd miss all the white guys with dope." He states that perhaps in 1989, Colombians were employing Mexicans as couriers, but that now most couriers are white males traveling alone. He relates stopping two Mexicans and seizing drugs, and also relates stopping a white family of three and seizing drugs. He tells the troopers that three of his last four seizures of drugs were from white motorists, and that

the fourth seizure was from a Mexican. There is one document used in the training sessions that indicates that, in Texas, there are a high number of Hispanics involved in the drug trade.

Plaintiffs allege that, if all inferences from these statements are construed in their favor, there would be a disputed issue of material fact. We disagree. Even viewed in the light most favorable to plaintiffs, the examples given by Snyders are clearly intended to illustrate that the use of race as an indicator is counterproductive. Snyders' occasional use of the term "Mexican" does not lead to the conclusion that he was training troopers to stop motorists on the basis of their race. The fact that one example discussed a Hispanic motorist who was stopped for drugs "does not create an inference that Snyders was teaching Illinois police that Latino drivers are more likely to be transporting drugs." Chavez, 27 F. Supp. 2d at 1076. Further, the presentation of one document citing the high percentage of Hispanics in the drug trade does not support a conclusion that Snyders "directed" officers to racially profile.

The second allegation is that Snyders taught Trooper Cessna that race was one factor to be considered in determining whom to stop. Even if we were to accept that Cessna was taught to use race as an indicator--and he did not testify that he was--there is no evidence that Snyders did the teaching. Cessna's original Valkyrie training program was led by two instructors, and he also received subsequent training once a year in two to three day sessions. There is no indication who conducted these sessions. Thus there is nothing to establish that Snyders taught Cessna to use race, even if Cessna was taught to do so. As the district court noted, "[t]he fact that a student allegedly discriminates . . . does not necessarily mean . . . that the student's former teacher taught the student to discriminate." Id. at 1075.

We will affirm the district court's grant of judgment in favor of defendant Snyders with respect to the claim of supervisory liability.

G.  Title VI

Plaintiffs' original complaint requested injunctive relief under sec. 1983 and the Fourteenth Amendment, but the district court dismissed this request under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Chavez v. Ill. State Police, 27 F. Supp. 2d 1053, 1075 (N.D. Ill. 1998); Chavez v. Ill. State Police, No. 94 CV 5307, 1996 WL 65992 (N.D. Ill. Feb 12, 1996). The plaintiffs then moved for leave to reinstate their claims for prospective relief, claiming that the ISP's actions in maintaining a practice of discrimination and in stopping, detaining, and searching plaintiffs pursuant to this practice constituted a violation of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000d et seq., and the administrative regulations of the Department of Justice effectuating Title VI, 28 C.F.R. sec. 42.101 et seq. Plaintiffs sought, inter alia, a permanent injunction barring the ISP from stopping, detaining, and searching individuals on the basis of race with or without legally sufficient cause or justification. The district court found that the plaintiffs did not have standing to pursue claims for equitable relief because there was no real and immediate threat of injury. See Chavez v. Ill. State Police, No. 94 CV 5307, 1999 WL 592187 (N.D. Ill. Aug. 2, 1999).

In response to the district court's ruling, plaintiffs moved to simplify the issues remaining for adjudication under Rule 16 of the Federal Rules of Civil Procedure, and asked the court to dismiss the Title VI regulatory claims for lack of jurisdiction. Plaintiffs also requested leave to amend their complaint, pursuant to Rule 15(a), to voluntarily dismiss with prejudice the Title VI statutory claims. The court granted the motion to simplify and thus dismissed the regulatory claims with prejudice under Rule 16. See Chavez v. Ill. State Police, No. 94 CV 5307, 1999 WL 754681 (N.D. Ill. Sept. 9, 1999). The court denied the motion for leave to amend the complaint, and advised plaintiffs that, if they elected to dismiss their remaining claims with prejudice under Rule 41(a)(2), the court would impose reasonable costs. Plaintiffs then moved to dismiss the Title VI statutory claims voluntarily and with prejudice, under Rule 41(a)(2). The court granted this motion. See Chavez v. Ill. State Police, No. 94 CV 5307 (N.D.

Ill. Sept. 21, 1999); Chavez v. Ill. State Police, No. 94 CV 5307 (N.D. Ill. Sept. 16, 1999).

On appeal, plaintiffs now argue that the judge erred in finding that they lacked standing to pursue injunctive relief, and ask us to reinstate their Title VI regulatory claim. Because the Title VI claims were dismissed and are no longer part of this litigation, we can not review the district court's finding or reinstate the plaintiffs' claim. Plaintiffs intimate that these dismissals were somehow improper. We find otherwise.

The court dismissed the plaintiffs' regulatory claims, at plaintiffs' request, pursuant to Rule 16. Rule 16(c) states that the court may consider, and "take appropriate action, with respect to (1) the formulation and simplification of the issues, including the elimination of frivolous claims or defenses." Fed. R. Civ. P. 16(c)(1); see also G. Heileman Brewing Co., Inc. v. Joseph Oat Corp., 871 F.2d 648, 650 (7th Cir. 1989) (en banc). While this rule is directed toward pre-trial conferences, it "is not inconsistent with the general purpose of Rule 16" to use this rule "to determine whether there are any issues remaining in the case that justify proceeding to a full trial on the merits." 6A Charles Alan Wright, et al., Federal Practice & Procedure sec. 1529, at 301 (2d ed. 1990). The court would have had the power to dispose of the claim sua sponte and did nothing improper by granting plaintiffs' request for dismissal.

Likewise, the court dismissed the plaintiffs' Title VI statutory claims at the plaintiffs' request, pursuant to Rule 41(a)(2). Rule 41(a)(2) addresses the effect of voluntary dismissals, and states that "an action shall not be dismissed at the plaintiff's insistence save upon order of the court and upon such terms and conditions as the court deems proper." Plaintiffs requested a voluntary dismissal with prejudice and this is what the court granted. "The case law is clear . . . that when a district court grants voluntary dismissal under Federal Rule of Civil Procedure 41(a), a plaintiff normally has neither the reason nor the right to appeal the dismissal because the plaintiff has received the relief it requested." Boland v. Engle,

113 F.3d 706, 714 (7th Cir. 1997) (citations omitted).

Plaintiffs wanted to dismiss these claims to enable immediate appellate review, and they openly explained their reasoning:

The principal concern of this lawsuit has always been systematic racial profiling by the ISP. . . . As a result of this Court's rulings . . . this lawsuit cannot result in an injunction . . . . Dismissal with prejudice of these claims will facilitate the efficient resolution of the merits of this litigation by permitting plaintiffs to obtain a final judgment from which they can immediately appeal . . . .

Plaintiffs' Motion to Voluntarily Dismiss with Prejudice Certain Claims at paras. 1-2, 5. By moving to dismiss the Title VI claims, however, the plaintiffs limited themselves to the possibility that they could get injunctive relief based on their equal protection or sec. 1983 claims. They ask us to reinstate the regulatory claim, but we can not reinstate what they voluntarily dismissed. While they may wish this was not so, it is the legal consequence of their very purposeful actions.

H.  Payment of Litigation Costs as a Condition of Voluntary Dismissal

On August 4, 1999, plaintiffs advised the district court judge that, in response to the court's numerous unfavorable rulings, they intended to dismiss their remaining claims with prejudice in order to take an immediate appeal. As noted above, the court denied the request for leave to amend the complaint, dismissed the Title VI regulatory claims pursuant to Rule 16 of the Federal Rules of Civil Procedure, and advised plaintiffs that, if they elected to dismiss the remaining claims pursuant to Rule 41(a)(2), the court would impose reasonable costs. Plaintiffs opposed the imposition of costs, but the court ruled that "an award of reasonable costs will be a condition precedent to entry of an order permitting the plaintiffs to voluntarily dismiss their remaining claims." Chavez v. Ill. State Police, No. 94 CV 5307, 1999 WL 754681, at *6 (N.D. Ill. Sept. 9, 1999). Plaintiffs

eventually accepted the court's condition on dismissal. Noting the seriousness of the decision, the court required proof that the named plaintiffs voluntarily sought to dismiss their remaining claims, and each of the named plaintiffs submitted a sworn declaration expressly agreeing to the conditions of dismissal. The court then granted plaintiffs' motion to voluntarily dismiss the remaining claims with prejudice under Rule 41(a)(2). The plaintiffs subsequently filed their notice of appeal with this court.

In October 1999, the defendants moved for, inter alia, immediate payment of all costs. Plaintiffs responded that they would seek a stay of payment pending appeal under Rule 62(d). On October 22, the district court granted defendants' motion for immediate payment, noting that the "fundamental problem with the plaintiffs' position regarding costs is that the court specifically ordered that 'an award of reasonable costs will be a condition precedent'" to voluntarily dismissal. Chavez v. Ill. State Police, No. 94 CV 5307 (N.D. Ill. Oct. 22, 1999) (quoting Chavez, 1999 WL 754681, at *6 (N.D. Ill. Sept. 9, 1999)). The court further stated that if plaintiffs "wish to renege on their acceptance of this condition, they must establish that they misunderstood its nature, as a change of heart is not enough to reopen proceedings at this point." Id. Plaintiffs did not attempt to withdraw their motion to dismiss.

In late November the district court taxed costs in the amount of $22,800.72. Judge Manning reiterated that payment of costs was a condition precedent to her dismissal order, and that the costs award would need to be paid regardless of the result on appeal. Following that decision, the plaintiffs moved to alter or amend the judgment pursuant to Rule 59. Plaintiffs also moved for a stay of payment pending appeal. On January 13, 2000, the court denied plaintiffs' motion to alter or amend the judgment, but did grant the requested stay of payment. Shortly after, plaintiffs filed a notice of appeal from the court's cost orders, challenging the decision to tax costs as a condition on voluntarily dismissal with prejudice.

As we noted in our discussion of the Title VI claims, a court may include, in its order for voluntary dismissal, whatever "terms and conditions" it deems proper. Fed. R. Civ. P. 41(a)(2). The district court has broad discretion in this respect, and we will overturn an imposition of conditions only if the court abused its discretion. See Babcock v. McDaniel, 148 F.3d 797, 799 (7th Cir. 1998); LeBlang Motors, Ltd. v. Subaru of America, Inc., 148 F.3d 680, 686 (7th Cir. 1998). Clearly, the court here did not abuse its discretion. Judge Manning repeatedly stressed the import of the plaintiffs' decision to voluntarily dismiss their claims. She decided not to assess attorneys' fees, as the parties would have incurred greater legal costs had they gone to trial, but did exercise her discretion to require the plaintiffs to pay costs as a condition of dismissal. The plaintiffs abandoned their arguably meritorious remaining claims; this type of decision should not be taken lightly, particularly after five years of briefing, discovery, motions, orders, and so forth. As noted by Judge Manning, "the award of reasonable costs to the defendants reflects the court's decision that the price of a Rule 41(a)(2) voluntary dismissal with prejudice on the eve of trial in this hotly-litigated 1994 case is payment of reasonable costs." Chavez v. Ill. State Police, No. 94 CV 5307 (N.D. Ill. Nov. 19, 1999). It is true that a plaintiff seeking a voluntary dismissal "is not required to accept whatever conditions the district court may impose." Marlow v. Winston & Strawn, 19 F.3d 300, 304 (7th Cir. 1994). The appropriate response, however, would be to decline to accept the conditions, not to accept them and then argue that their imposition was an abuse of discretion. Plaintiffs agreed to the district court's conditions and then dismissed their claims with prejudice. We find that the order requiring payment of costs as a prerequisite to voluntary dismissal did not constitute an abuse of discretion. Costs were properly assessed by the district court.

Because the plaintiffs have not prevailed on appeal, we need not reach the issue of whether it would have been proper to require plaintiffs to pay costs even if their appeal had been successful.

III.  Conclusion

  Notwithstanding the disposition of this case, we recognize the destructive effects of racial and ethnic profiling by any police agency. Plaintiffs have not proven that the Operation Valkyrie officers of the Illinois State Police stop, detain, and search African-American and Hispanic motorists on the basis of racial or ethnic profiling. Yet, unfortunately, the oft-cited public perception that race and ethnicity play a role in law enforcement decisions on Illinois highways will no doubt remain. The ISP has asserted throughout this litigation that they do not condone race-based law enforcement action; much of the evidence in this case indicates that they endeavor to conduct police activity through means that respect constitutional rights. How to change public perception and demonstrate compliance with constitutional requirements is a matter the State of Illinois may wish to consider.

  On the basis of the foregoing analysis, we AFFIRM the district court's grant of summary judgment in favor of the defendants on plaintiffs' equal protection and supervisory liability claims, and we AFFIRM the dismissal of Peso Chavez's right to travel claim.

FOOTNOTES

/1 For the purposes of this opinion, "white" is meant to indicate "white, non-Hispanic."

/2 The field report form permits racial identification of a citizen as, inter alia, Mexican, Puerto Rican, or Other Hispanic; for the purposes of analysis, Shapiro combined the several Hispanic categories into one. The citations and warnings database does not include infor-mation on race and ethnicity, so plain-tiffs' experts estimated the number of Hispanic motorists contained in this database through analysis of the Spanish surnames provided by the U.S. Census Bureau. As there is no cohesive set of surnames that would allow identification of whites or African-Americans, there is no analysis of the citations and warnings database with respect to those groups.

/3 Plaintiffs subsequently discovered that

the Center had presented the experts with incomplete or incorrect data. The district court granted a motion to stay defendants' then pending motion for partial summary judgment so plaintiffs could obtain a new analysis of the data. Plaintiffs found the new statistics to be more favorable than the original data, so they sought to withdraw the original expert opinions, and substitute new, revised versions. This motion was denied. Chavez v. Ill. State Police, 27 F. Supp. 2d 1053, 1065 (N.D. Ill. 1998). As far as we can determine, the revised expert opinions are the ones presented by the plaintiffs on appeal.

/4 The magistrate judge focused only on Rule 20, and did not discuss the relevancy of Rule 15(a), which discusses amending the pleadings, or Rule 21, which addresses misjoinder and non-joinder of parties. The district judge did refer to case law addressing the Rule 15(a) standard for denying leave to amend a complaint, though she did not address the text of this rule. We feel discussion of both Rule 15 and 20 is appropriate, therefore we address both.

/5 ISP officers are required to radio headquarters when making a stop, as discussed above. However, it is not clear from the record how long this radio log is maintained, or whether plaintiffs attempted discovery along these lines.

/6 Lee identified Lauterbach as a person in his late twenties or early thirties with a mustache and a tan uniform, driving a white or tan ISP vehicle with flashing lights on top. In contrast, the ISP states that Lauterbach would have been a mustache-less, forty-six year old trooper wearing green pants, driving a plain blue squad car with lights located in the grill. Lee stated that Fraher wore a normal state trooper's uniform and drove a vehicle with blue flashing lights located on top. The ISP states that Fraher wore green pants and a baseball cap, drove a vehicle with a red rotating light on the dash, and patrolled with his canine Zeus in the car, whom Lee did not see or hear.

/7 The instant case is one of several currently in progress. See Daniels v. City of New York, No. 99 CIV. 1695 (SAS), 2001 WL 62893 (S.D.N.Y. Jan. 25, 2001) (certi-

fying a class of persons stopped and frisked within the city of New York); Ledford v. City of Highland Park, No. 00 C 4212, 2000 WL 1053967 (N.D. Ill. July 31, 2000) (certifying a class action of persons subjected to racial profiling by the Highland Park Police Department); Farm Labor Org. Comm. v. Ohio State Highway Patrol, 95 F. Supp. 2d 723 (N.D. Ohio 2000) (ruling on various claims in a class action suit challenging the questioning of Hispanic motorists about their immigration status); State of New Jersey v. Ballard, 752 A.2d 735 (N.J. Super. Ct. App. Div. 2000) (granting discovery in furtherance of a claim that the N.J. state police selectively enforce the motor vehicle laws).

/8 Plaintiffs argued that their equal protection claims should be analyzed under the pattern and practice analysis used in Int'l Bhd of Teamsters. The pattern and practice analysis is only relevant to statutory schemes which utilize the McDonnell-Douglas burden shifting framework, like Title VII, and thus it can not be used here.

/9 The Hunter plaintiffs used their statistics to satisfy the effect prong; however, they also had "convincing direct evidence" of discriminatory intent and it was through proof of both discriminatory effect and intent that they proved a violation of the Equal Protection Clause.

/10 The ISP issued a total of 3.1 million citations and warnings over the period from January 1990 through February 1997. Citations and warnings issued by the same officer at the same time were grouped together as one incident.

/11 The defendants cited this number as the number of total field reports, after excluding reports by administrative and commercial vehicle troopers. Plaintiffs have not stated that this is an unjustifiable exclusion, nor have they indicated what the total number of field reports would be without this exclusion. Shapiro's report does not say how many field reports he reviewed, just that he analyzed the reports from 1985-1997. Ginger's report indicates that the field report database included 1.4 million field reports, though if this is based on the same database as Shapiro's report, it means that they both reviewed field re-

ports from 1985-1989, years that were not included in the citations and warnings database (which covered 1990 to 1997). In the absence of any proffered alternative, we thus assume that only 88,618 of the citations and warnings resulted in field reports, as stated by the defendants.

/12 The Supreme Court has refrained from identifying the constitutional source of this right. See Saenz, 526 U.S. at 501 (noting that the right of "free ingress and regress to and from" neighboring states was expressly mentioned in the text of the Articles of Confederation). In light of this uncertainty, we examine whether the plaintiffs state a legal claim under this component, even though they only allege a violation of their rights under the Privileges and Immunities Clauses of the Constitution.

/13 In the district court, plaintiffs also brought claims against Terrance Gainer, the Director of the ISP, and Edward Kresl, District Commander of the ISP. These claims were dismissed under Rule 16 of the Federal Rules of Civil Procedure on the basis of the court's granting of summary judgment on the equal protection claim. Plaintiffs' briefs to this court only alleged error in the district court's grant of summary judgment with respect to defendant Snyders, though one footnote in their equal protection analysis asked us to reinstate the supervisory claims against Gainer and Kresl. We will not reinstate these claims as plaintiffs did not object to the magistrate judge's recommendations in front of the district court judge and therefore can not challenge them now.